Harold KONIGSBERG, Petitioner,

v.

Pasquale J. CICCONE, M.D., Director of Medical Center, Springfield, Mo., Myrl E. Alexander, Director, Bureau of Prisons, U. S. Dept. of Justice, Washington, D. C., the Attorney General of the U. S., Washington, D. C., the U. S. Attorney for the Western District of Mo., and any person having the custody or control of the prisoner Harold Konigsberg, Respondents.

No. 16555–4.

United States District Court
W. D. Missouri, W. D.

May 3, 1968.

Austin F. Shute, Kansas City, Mo., for petitioner.

Charles French, Asst. U. S. Atty., Kansas City, Mo., for respondents.

## ORDER

ELMO B. HUNTER, District Judge.

Petitioner Harold Konigsberg, through his employed attorney, on August 2, 1967, filed in this Court his petition for a writ of habeas corpus. The petitioner alleged that he is presently detained at the United States Medical Center for Federal Prisoners in Springfield, Missouri, as a convicted person pursuant to a judgment of the United States District Court for the District of New Jersey, pronounced on July 16, 1963, committing the petitioner to the custody of the Attorney General of the United States for ten years for violation of Title 18, U.S.C., Section 659. This sentence was imposed following a plea of not guilty by petitioner and by a finding of guilty by a jury upon trial. Petitioner appealed to the United States Court of Appeals for the Third Circuit. That court affirmed the conviction. See 336 F.2d 844. Certiorari was denied by the United States Supreme Court, see 379 U.S. 930, 85 S.Ct. 327, 13 L.Ed.2d 342. Additionally, petitioner was tried by the State of New York on a state charge and was sentenced by that court to a term of 33 to 40 years.

In his present petition for habeas corpus petitioner claims that numerous violations of his constitutional rights have occurred, and that by virtue of those violations, and other illegal treatment, he is entitled, among other things, to have his sentences of conviction set aside, and to his freedom. He also seeks relief of an administrative type.

After earlier settings and continuances granted at the request of petitioner's counsel, the granted evidentiary hearing commenced on Friday, March 1, 1968. The order setting that hearing stated that the Court would hear evidence on the following contentions of petitioner, as well as such other contentions as he desired to present evidence on: (1) Whether petitioner has been subjected to cruel and inhuman punishment in violation of the Eighth Amendment. (2) Whether petitioner was certified, de-

certified, and sent to New York State for trial, and then recertified under Section 4241 of Title 18, U.S.C., upon his return, and, if so, whether such action violated any of petitioner's rights. (3) Whether petitioner was transferred from the Medical Center at a time when he was certified pursuant to Section 4241 of Title 18 United States Code, and, if so, whether said transfer was in violation of law. (4) Whether petitioner's being removed from the Medical Center in the fall of 1967, allegedly to appear before a grand jury, was in fact for the purpose of circumventing a hearing on the matters raised by petitioner in his petition to this Court. (5) Whether petitioner's mail, including mail to and from his attorney, was being unreasonably interfered with. (6) Whether, as a result of the government's interference with petitioner's mail, and other limitations on his access to counsel, petitioner is being deprived of effective assistance of counsel, in violation of the Sixth Amendment. (7) Whether petitioner is being unreasonably restrained from making telephone calls to his attorney and others. (8) Whether petitioner has ever been transferred incognito, and, if so, whether that was violative of his constitutional rights. (9) Whether the United States government has illegally taken and retained a wristwatch of petitioner's. (10) Whether the United States government has illegally confiscated approximately $1,200 which belongs to the petitioner. (11) Whether petitioner is subjected to religious discrimination in violation of his First Amendment rights. (12) Whether the government in any way acted illegally in regard to petitioner's certification pursuant to Section 4241, Title 18, United States Code, or decertification under the same section. (13) Whether petitioner is being denied adequate food and water. (14) Whether the government has falsified any of petitioner's records. (15) Whether the government has illegally taken petitioner's legal materials or other property of his from him.

Either at the commencement of the trial or during the trial the following additional contentions were made by the petitioner, which the Court deemed to be among those to be decided by the hearing: (1) Whether petitioner, while at the Springfield Medical Center, is being denied any constitutional rights in connection with his right to worship and his right of religion. (2) Whether petitioner is being discriminated against unlawfully because he is Jewish. (3) Whether petitioner is the subject of a conspiracy by the Bureau of Prisons and personnel of the Springfield Medical Center, and others, including the Attorney General of the United States, to deprive him of his access to the courts, his confidential access to his attorneys, his access to his legal materials, and his access to materials helpful to him in the preparation of and presentation of his numerous pending legal actions. (4) Whether the personnel of the Springfield Medical Center conspired to subject him to cruel and inhuman punishment, to harass and confuse him, to degrade him, and to punish him, contrary to law and to the rules of the institution, by, among other things, keeping from him the usual items of the institution, such as a full handled toothbrush, fresh changes of clothes, showers, a razor for his own use, toothpaste, clean blankets and sheets, his art supplies, his diary, handkerchiefs and other items available in the commissary of the institution, either by prohibiting his possession of such items or by wrongfully taking these items from him, or by limiting the number of things that he might possess in such an unreasonable manner as to in effect deny him the possession of these items. This contention includes deprivation of pencils, pens, tablets of paper, carbon paper, daily notes, newspaper articles, newspapers, magazines, and legal material. (5) Petitioner also complains that various of the United States deputy marshals deprived him of food and water, and otherwise mistreated him while he was being transported from the Medical Center to this Court, and from this Court to the Leavenworth

Penitentiary, where he was kept overnight each night during the trial. (6) Petitioner finally complains that upon his return to the Springfield Medical Center on March 18, he was beaten and mistreated by some of the personnel of the Medical Center.

Petitioner's attorney for many years has been a New York lawyer, Frank Lopez. Mr. Lopez filed the petition for writ of habeas corpus on behalf of petitioner, filed other matters in connection with the case, and was at all times the attorney of record in the case. However, at all pertinent times petitioner has asserted his right to appear pro se and to represent himself. At the trial Mr. Lopez failed to appear, but apparently did turn over petitioner's file to petitioner's personally selected and employed local counsel, Mr. Austin Shute, a well-known and highly experienced Kansas City attorney. Mr. Lopez remained away from the trial.

Petitioner, after being told by the Court that he could have a continuance if he wished it, repeatedly acknowledged his complete satisfaction with his representation by Mr. Austin Shute, and advised the Court that he wished to proceed, with Mr. Shute present at the counsel table with him; and that he did not wish to request a continuance, or to have a continuance, because of the absence of Mr. Lopez or for any other reason.

Petitioner has represented himself in the past in one or more substantial criminal trials, and professes some knowledge of courtroom procedure. Additionally, during the trial of this case, petitioner had available Mr. Shute, with whom he consulted upon numerous occasions, and who upon occasion participated with the petitioner in the examination of witnesses and the presentation of the case.

At the outset it is helpful to delineate to some extent the proper scope of habeas corpus in this type of case. The "Great Writ" as it is sometimes referred to has such ancient origins as to antedate Magna Carta. It is preserved by the Constitution of the United States. It is basically designed to give a person restrained of his liberty the opportunity and right to test the legality of the restraint and to relief from unlawful imprisonment. Its application has somewhat expanded with the passage of time. Today a permitted use is to reach and prevent certain continuing illegal and unconstitutional treatment of convicted persons in custody where such treatment amounts to cruel and unusual punishment. In some few and unusual instances it is also available to reach extreme acts of official misconduct depriving the prisoner of fundamental rights where such deprivation also results in unlawful administration of sentence. This expanded type of use does *not* result in vitiating the sentence of confinement so as to free the prisoner but rather results only in an equitable type of restraint to preclude the continuation or resumption of the illegal act or acts involved. Thus, the writ is not available generally where the complaint is simply one of past wrongs, not involving the validity of the confinement, and not of a continuing or probably continuing nature. Nor is the writ a substitute for other available adequate actions or remedies.

The general statements above made must, of course, be applied in the light of the teachings of the appropriate appellate courts. The most recent pronouncement in this circuit on the subject of habeas corpus is by Judge Gibson in Douglas v. Sigler, Warden, 8 Cir., 386 F.2d 684: In stating the well recognized applicable principles Judge Gibson declared: "The petitioner and other inmates of penal and correctional institutions should realize that the penal and correctional institutions are under the control and responsibility of the executive branch of the government and that courts will not interfere with the conduct, management and disciplinary control of this type of institution except in extreme cases. As this Court has stated in Lee v. Tahash, Warden, 352 F.2d 970, 971 (8th Cir. 1965), * * * 'it is settled doctrine that except in extreme cases

the courts may not interfere with the conduct of a prison, with its regulations and their enforcement, or with its discipline.' * * * The matter of the internal management of prisons or correctional institutions is vested in and rests with the heads of those institutions operating under statutory authority, and their acts and administration of prison discipline and overall operation of the institution are not subject to court supervision or control, absent most unusual circumstances or absent a violation of a constitutional right." To the same general effect see, Sutton v. Settle (8th Cir. 1962), 302 F.2d 286, cert. den. 372 U.S. 930, 83 S.Ct. 876, 9 L.Ed.2d 734; Harris v. Settle (8th Cir. 1963) 322 F.2d 908.

## PETITIONER'S CLAIM REGARDING CRUEL AND INHUMAN PUNISHMENT

Petitioner called himself as a witness, and proceeded to give his testimony in a narrative type statement. It would serve no useful purpose to set out in detail petitioner's testimony concerning his claim that he was subjected to cruel and inhuman punishment, during the time that he was incarcerated at the Springfield Medical Center, and while he was being transported to various places to and from that Center, and that such mistreatment is of a continuing nature and according to an intentional course of conduct of Medical Center personnel. The gist of it is that the personnel of the Bureau of Prisons, employees of the Medical Center, and the deputy marshals who took him to various places to and from that Medical Center, deliberately and intentionally brutally mistreated him by beating him, by incarcerating him naked in "strip cells",[1] by depriving him of adequate food and water, by denying him adequate access to his counsel, by depriving him of access to his legal

---

[1]. The so-called "strip cell" is a portion of a unit known as the 10–B unit. This unit is composed of 39 closed front cells. The door to each cell is solid construction, with four windowpanes in the upper panel. Each cell has a window to the outside, with security bars and security screens. A central ventilating and heating system serves each cell via ventilation ducts. Twenty-nine of the cells are complete rooms, with toilet stool, lavatory and bed. Four cells are equipped as described above, but do not have lavatories. The remaining six cells have only a toilet. One or two of these six cells apparently have no toilet stool, rather, only a toilet hole in the floor. These cells are utilized for patients requiring maximum control, such as suicidal risks and those who are highly destructive. A mattress pad is ordinarily used for a bed, unless contraindicated by the attending physician. These 39 cells of the 10–B unit have concrete walls.

The Medical Center policy statement concerning the 10–B unit, with regard to clothing and bedding, provides: "Unless there is substantial reason to believe that an inmate is either a suicidal risk or so highly disturbed that he is likely to be destructive, all inmates shall be admitted to segregation (after thorough search for contraband) dressed in normal institutional clothing and shall be furnished a mattress and bedding. Whenever this appears to be unwise, a report shall be furnished the Chief Correctional Supervisor. In no circumstances shall an inmate be segregated without clothing except when prescribed by the 10–South Doctor and/or the Medical Officer of the Day.

"Personal Hygiene. Segregated inmates shall have the opportunity to maintain acceptable levels of personal hygiene. They will be issued toilet tissue, tooth brushes, combs, shaving equipment for use and other necessary toiletries. Those inmates in Administrative Segregation who have been designated by a doctor as violent to themselves or to others, will have to be quartered in such a manner that they will not be harmful to themselves or others. Personal sanitation procedures and issue of toiletry supplies will be instituted so that each inmate's personal hygiene will be maintained at a medically acceptable level, yet he will be safe from harm.

"Duration of Administrative Segregation. Consistent with Administrative Segregation, no inmate shall be segregated longer than necessary.

"Supervision. In addition to the direct supervision afforded by the unit officer, each segregated inmate shall be seen daily by the Ward physician or medical technician and a Correctional Supervisor.

\* \* \* \* \*

"Correspondence and visits. In the absence of direct and compelling reasons to

books, legal manuscripts, legal supplies, personal notes, and writing material, by denying him free access to the courts and generally, by trying to, and upon occasion, succeeding in getting him charged with various infractions of rules of the institution, followed by disciplinary action, including substantial forfeitures of good time credit, and by generally intimidating him, threatening him, abusing him, and refusing to permit him the usual rights and privileges of other inmates similarly situated in the institution.

■ There is some merit to a few of petitioner's charges, as will be gone into in detail later in this opinion. However, a fair review of the entire evidence persuades that petitioner has not been subjected to cruel and inhuman punishment in violation of the Eighth Amendment. The evidence indicates that petitioner is a man of unusual and complex personality and disposition. He takes great pride in his physical prowess. He is very demanding as to everything that he considers to be a right of his, and has no hesitation to engage the various members of the Springfield Medical Center personnel in challenges, in heated arguments, and to use provacative language. In this he is somewhat selective and admires a few of the personnel of the institution, while having utter contempt for others. He has a total distaste for confinement and for discipline per se. The evidence convinces that he has been a substantial problem to the Medical Center personnel during the entire time that he has been an inmate at the insti-

tution, and has been a subject of concern to the institution.

Illustrative of his more serious contentions is the one that, on February 19, 1968, he was severely beaten by some five or more guards of the Springfield Medical Center. The incident apparently arose in the following manner. Petitioner was considered to have violated a rule of the Medical Center by being in a forbidden area. When so advised, he argued with the institution employee, who directed him to leave the area. The argument apparently grew heated. Petitioner refused to leave the area, and, as a result, a number of the institution employees physically took the petitioner to what is known as the "B" Unit of the institution. There, in accordance with the rules of the institution petitioner was required to undress for a search for contraband. As a part of that search, it is customary for the exterior area between the buttocks to be inspected, but not touched, in order to determine if anything that might be dangerous is concealed there. Petitioner refused to permit a view of that area because a medical doctor was not in charge. The inspection of that area was thereafter conducted, obviously over his physical attempt to prevent it, and after being so conducted, he was either escorted, or partly escorted and partly dragged, to the "strip cell".

Petitioner's version, as supported by some inmate testimony, was that he was kicked, jabbed, pushed and dragged to the cell. The testimony on behalf of institution personnel was that he was escorted there by two men having hold of each of his arms, and with others being

the contrary, inmates in segregation shall not be required to forfeit correspondence and visiting privileges."

The Bureau of Prisons Policy statement provides in part:

"c. Clothing and Bedding. All inmates shall be admitted to segregation (after thorough search for contraband) dressed in normal institution clothing and shall be furnished a mattress and bedding. In no circumstances shall an inmate be segregated without clothing except when prescribed by the Chief Medical Officer

for medical or psychiatric reasons. If an inmate is so seriously disturbed that he is likely to destroy his clothing or bedding a medical officer shall be notified immediately and a regimen of treatment and control instituted with the concurrence of the medical officer."

"h. Correspondence and Visits. In the absence of direct and compelling reasons to the contrary, inmates in segregation shall not be required to forfeit correspondence and visiting privileges."

present, forced to walk down the corridor to the cell, and to enter it. Officer Edwards testified that it was his responsibility for ordering petitioner, for control purposes, to be searched and placed in the "strip cell" and that he directed the employees involved to use whatever force was necessary to accomplish that. It is the Court's view that somewhere between petitioner's version and the institution personnel's version of the incident lies the truth of the matter. The Court is persuaded that in their effort to conduct the search and to convey petitioner down the corridor to the "strip cell", petitioner was pushed, shoved and possibly jabbed. However, it is also the Court's view that the petitioner was the primary cause of the treatment that he received in that he refused to submit to the customary search, physically resisted the officers who had the duty of making that search, and continued some resistance as they were conducting him to the "strip cell" after the search. Viewed in its entirety, the event was not a beating of petitioner, as he contends, but, rather, simply was that he received some bruising as a result of his own resistance. There is no evidence that is convincing that the bruising and physical force exerted upon him was unreasonable in view of the situation with which the employees of the institution were confronted. There is nothing that occurred in the incident which amounted to cruel and inhuman punishment.

Petitioner also claims that upon two other occasions he was struck and abused. These two occasions were alleged to have occurred on February 21, 1968, and on June 13, 1967. The evidence concerning the February 21, 1968, incident, even as explained by petitioner, indicates that he provoked the institutional authorities into exerting some control force over him. There was no deliberate beating. No cruel or any inhuman punishment was involved. The other incident occurred sufficiently long ago, and outside the Springfield Medical Center,

that it cannot be said to have any relationship to that institution, or to its personnel. Nor does petitioner's version of it persuade that it was not an event which he provoked, or that it amounted to cruel and inhuman punishment.

## STRIP CELL

Petitioner also contends that as a part of the continuing policy and determination of the respondents to give him cruel and unusual punishment he was retained naked in the "strip cell" for several hours. Testimony on behalf of the institution was to the general effect that whenever any inmate of the institution refuses to obey a lawful order, and becomes combative or violent, the personnel of the institution are authorized to use whatever force is necessary to have that inmate undress, be searched, and placed in the cell naked, there to be held temporarily until the inmate's physician can be contacted so that he can examine the inmate for injury; determine what clothing or articles he may be safely given; and determine whether he may be transferred from that cell to one containing some furniture or furnishings. In the particular instance, petitioner was placed in the "strip cell" probably around nine o'clock in the morning. There is a dispute of an hour to an hour and a half in the testimony. At most he was retained there for approximately three to three and a half hours. Immediately upon his being placed in the cell effort was made to locate his physician, who had left the institution temporarily for an early lunch. By the time his physician had returned to the institution and had examined petitioner, the three to three and a half hour interval had occurred. Being convinced that this event resulted from the happenchance of the doctor being temporarily away and the neglect of institutional personnel to provide petitioner with suitable clothing during the resultant interval, the Court does not deem this to be cruel and inhuman punishment, contrary to the Eighth Amendment.[2]

2. The Eighth Amendment protects against cruel and unusual punishment. For examples see, Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793;

Nor is the incident likely to be repeated in view of the Medical Center policy statement, and the lack of any credible evidence indicative of any intent on the part of the Medical Center not to conform to such statement.

## VISUAL INSPECTION OF EXTERIOR PART OF BODY FOR CONTRABAND

As a part of petitioner's claim of cruel and unusual punishment of a continuing nature or probable to recur, petitioner asserts a visual inspection incident previously described. The Court is not impressed with petitioner's contention that he is entitled to resist exposing his buttocks area to an external visual inspection unless a medical doctor is present. The inspection does not involve any touching of the petitioner by anyone else, and is simply a matter of externally viewing the area by having the petitioner stoop to a position where such view can be obtained. It is no violation of his rights to conduct that type of search and view of a typical hiding place for contraband by a non-medical administrative person.

## RELIGIOUS DISCRIMINATION CHARGE

Petitioner testified that while he was being held under close custodial supervision, and more particularly while confined in 10–B unit, he was not permitted to participate in any religious services, and that when transferred from close custodial supervision, he is permitted to attend Jewish religious services only on condition that he request and is issued a pass for that purpose. He testified that Protestants and Catholics are not re-quired to obtain a pass, and that religious services are made available to them much more often than to Jewish inmates.[3]

The thrust of petitioner's testimony was that the Jewish group was a small one and that there was no regular rabbi provided. Rabbi Jacobs of Springfield, Missouri, did very occasionally appear and provide Friday evening or Saturday services. Petitioner asserts that while he was held in the 10–B section, his pass to attend Jewish services was not honored, and Protestants and Catholics in 10–B were not only not required to have a pass to attend religious services, but were permitted to attend their regular religious services. Petitioner believes that it is discriminatory that he should have to obtain a pass when Protestants and Catholics do not, and that it is further discrimination to permit Protestants and Catholics in 10–B to attend their religious services and to refuse to permit him or other Jews in 10–B to attend their religious services.

Other evidence indicated that within the Medical Center the current religious memberships of the inmates are: (1) 150 to 200 Catholics; (2) 600 to 700 Protestants; (3) 13 Jews; (4) 5 Muslims (5) 60 Jehovah's Witnesses; (6) 10 Christian Scientists; (7) a scattering of other faiths.

Chaplain Reed, a Protestant, and Father Heyman a Catholic, are full time employees of the Medical Center, and regularly conduct religious services for those inmates who wish to attend. Their services are conducted on Sunday mornings, at approximately the same time. On Sunday mornings practically all other activi-

---

Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630; Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758.

3. Government Exhibit 5 is a communication between petitioner and Chaplain Reed concerning the subject of Jewish services and availability of a rabbi. It reads: "As I mentioned to you in our conversation the other day, we have Jewish services on Saturday evenings, six p. m. to seven p. m., conducted by a member of the inmate congregation. I

am preparing a pass for you to Jewish services, and it will be available for you to attend when it is medically and custodially possible.

"Our rabbi is from the community, comes to the institution for the high holidays. Seldom, in the past, has he made individual visits with me. You can write him, if you like, and request a personal visit. Rabbi Ernest I. Jacobs, 1455 N. Clay, Springfield, Missouri. If you would like to talk further with me, have the officer call."

ties within the Medical Center are shut down until after religious services have terminated. Catholics and Protestants are not required to have a pass to attend these regular Sunday morning religious services, for the given reason that there are then available in an abundant number sufficient guard and other security type personnel to provide all necessary security. Inmates who are out of their cells are known to be out of their cells for the reason that they are going to or from a religious service, and if not they are clearly in an unauthorized status.

Those who are not Catholics or Protestants are required to obtain permanent religious passes in order to be authorized to attend their religious services. The given reason for this is that those services are conducted at times other than Sunday morning by "inside" clergy, and at times when many other activities are going on within the institution. This necessitates the close control of those passing to and from in the corridors to the extent that they need to have some authorization to indicate that they are in attendance of or going to or from a religious service. During such periods of time any inmate going to any place within the institution, such as to the library, theatre, clinic, etc., is likewise required to have a pass showing that authorization.

Thus, petitioner, who admittedly has a religious pass entitling him to attend all Jewish services, is not deprived of opportunity to attend Jewish religious services with the exception of such time as he is incarcerated in one of the close control rooms located in unit 10–B.

The practice as to inmates confined in the close control rooms located in 10–B is that Protestants and Catholics, even without a pass, are permitted to attend their regular Sunday morning religious services, if their attending physician on medical grounds has not otherwise limited them. However, inmates who are retained in rooms located in 10–B, other than Protestants and Catholics, are not permitted to attend their religious services, even though there is no medical reason why they should not, and even though they may possess a permanent religious pass. The reason given by the institution for this situation is that the Protestants and Catholics attend their religious services on Sunday morning, at times when there is an adequate number of security personnel available to conduct them to and from their religious services, and thus provide the necessary security control. However, the other religious groups, such as the Jewish, by virtue of the fact that they have their religious services on Friday evenings and Saturdays, present the problem that at those times the institution ordinarily does not have available sufficient guards or other security personnel to provide the required security escort of those inmates to and from their religious services. It is the institution's position that if they had sufficient security forces available at those times, such inmates would be permitted to attend their Friday evening or Saturday services. They are free to attend the Catholic and Protestant services held on Sunday mornings, if they wish to do so.

The Medical Center for some time has been operating under a policy statement titled "Institutional Religious Program". In it, the institutional policy is stated to be as follows: "It is the policy of this institution that the essential rituals and materials necessary for the practice of a religious faith, related to a community faith group, be made available to all patients and inmates." * * * "Services and meetings conducted by recognized community clergy of a particular faith group shall be open for all patients to attend, with the approval of the officiating clergymen, regardless of the patients' religious affiliation. Patients from 10–C and 10–D will be permitted to attend these services when appropriate escort and supervision are available. The institution Chaplains will conduct meetings and services as posted. Particular faith groups presently meeting with community clergy are: (a) Christian Science Group, (b) Jehovah's Witnesses Group,

(c) Jewish Group, (d) Muslim Group. Meetings and services conducted by patients will be limited to those persons indicating that particular faith group as their religious perference upon entering the Bureau of Prisons. Groups presently conducted by patient leaders are: (a) Jehovah's Witnesses, (b) Jewish Group, (c) Muslim Group, (d) Yokefellows' group (Protestant). Special passes from the appropriate Chaplain are required for attendance at the above meetings." * * * "(2) Religious materials and publications which are determined to be essential to the expression and/or study of a particular faith group shall be made available. (3) Printed materials, publications, books and papers, related to a community faith group, can be purchased or received. * * * (4) Religious medals or comparable insignia used by a particular faith group can be purchased or received. Restrictions on these are that no jewels shall be on them, and the chains for the medals shall not be less than 18 inches in length.

"Correspondence: Patients may correspond with clergymen and religious organizations either by mailing list or special purpose mail. Likewise, patients may receive mail from clergymen and religious organizations without their being on a mailing list. Special purpose mail of a religious nature shall be routed through the appropriate Chaplain".

█ Without a further detailing of the evidence, it is the view of this Court that, with the exception of the time when petitioner is housed in one of the close control rooms located in 10–B, the religious rules and practices of the institution are such that they do not in any way infringe upon petitioner's religious rights. As stated in Sostre v. McGinnis, 2 C.A. 1964, 334 F.2d 906, cert. den. 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 " * * * the practice of any religion, however orthodox its beliefs and however accepted its practices, is subject to strict supervision and extensive limitations in a prison. The principal problem of prison administration is the maintenance of discipline. * * * A prisoner has only such rights as can be exercised without impairing the requirements of prison discipline."

It is totally unrealistic to expect an institution, housing some 900 inmates, to provide, on a salary basis, employees of every possible religion, so that each and every inmate would have an institutional employee a counterpart of Chaplain Reed and Father Heyman. It is obvious that the institution does what it reasonably can to provide all religious groups with the opportunity of worship according to the tenets and beliefs of such group and without religious discrimination. The fact that Catholics and Protestants are not required to have a religious pass is simply the happenchance that their services occur only on a Sunday, when there are no other activities going on within the institution that require the type of security which a pass provides. Any person who wishes to go to any religious service being held on Sunday mornings is not required to have a pass, whatever his religious beliefs might be.

█ However, the situation is different as it concerns the inmates housed in the close control 10–B unit. The evidence indicates that at no one time are there very many so confined. According to Konigsberg's testimony and other evidence, on any given Friday or Saturday, it is very unlikely that there would be more than two or three so confined who would wish to attend their religious services. It is unrealistic to take the position that sufficient escorts cannot be obtained to conduct those two or three, or less, to their religious services, in view of the high importance the law places on the right to worship and the right to be free of religious discrimination. Therefore, respondents are hereby directed that at any time when petitioner is located or housed in a close control room located in 10–B, and wishes to attend a recognized religious service for Jewish inmates, he must be allowed to do so, unless (1) a physician of the institution has certified that for medical reasons, it would be dangerous or medically inadvisable to permit such attendance;

or (2) unless an officer in charge of the 10-B unit certifies that the inmate is so dangerous as to present a particular security risk above that presented by inmates from other parts of the institution who are allowed to attend religious services; or (3) unless the time at which the service is held or other conditions involved in permitting his attendance are such as to substantially and adversely affect the security, or safety or maintenance of orderly conditions within the institution.[4]

## CONTENTION CONCERNING CONSPIRACY

■ Petitioner is of the firm conviction that there is a conspiracy on the part of the Bureau of Prisons and the Attorney General's personnel to treat him harshly and to deny him constitutional rights by way of punishing him for his refusal to cooperate with federal authorities concerning grand jury and other investigations of organized crime, and that the organized crime section of the United States Attorney General's staff is particularly involved in the conspiracy. Careful review of all of the testimony does not result in any evidentiary support of this contention, but, rather, persuades that this is a suspicion of petitioner devoid of proof. The Court finds that there is no credible evidence of such conspiracy and that this contention of petitioner is without merit.

## CHARGE OF DENIAL OF CONFIDENTIAL ACCESS TO COUNSEL, INCLUDING ILLEGAL TREATMENT OF MAIL, DEPRIVATION OF LEGAL MATERIALS AND MONITORING OF TELEPHONE CALLS

■ Petitioner contends he is being deprived of the effective assistance of counsel in violation of the Sixth Amendment,[5] and is being unreasonably restrained in his endeavors to have confidential and timely communications with his attorneys.

■ (a) Telephone Calls:

The parties stipulated generally that the institution's records show petitioner made approximately 20 telephone calls to his out-state attorneys. On approximately five of those occasions petitioner's social worker stationed himself so close to the telephone that petitioner was using that the social worker could hear at least a portion of petitioner's side of the conversation. On those five occasions, the social worker made a written report stating very generally that during such conversation petitioner discussed such things as his family, money matters, legal problems, and his desire for legal material. On the other occasions the report of the social worker simply indicated that the petitioner either received or made a telephone call commencing at a certain time, and that the telephone call ended at a certain time. There was no mention as to the subject matter discussed. It was further stipulated that there was no wire tap or electronic surveillance involved, but simply that the particular social worker was situated about ten or twelve feet away from the telephone being used by petitioner, and kept petitioner in full sight during the conversation. Although not included in the stipulation, the Court's *in camera* review of the hospital files, made at the request of petitioner, revealed that the basic nature of the five so-called telephone reports was medical rather than of a "spying" nature. The case worker would note such things as whether the petitioner was calm or excited during the call, whether he seemed to maintain reasonable control of him-

4. The Bureau of Prisons Policy Memorandum reads in part: "FREEDOM OF RELIGIOUS BELIEF AND PRACTICE.
 "a. The objective of the Bureau of Prisons is to extend the greatest amount of freedom and opportunity in this area as is consonant with the total mission of the Bureau. This includes the requirements of maintaining security, safe-

ty, and orderly conditions in the institutions and of distributing available resources as wisely as possible among the many kinds of services and activities which contribute to these aims and to the purpose of rehabilitating offenders."

5. Reasonable access to the courts is guaranteed by the Constitution. See, Ex

self, whether he appeared to react in a rational manner to whatever was being said to him, etc. Thus, it would appear that the basic purpose of the social worker being stationed where he was essentially was to keep himself and the institution informed concerning the medical aspects of petitioner's behavior, rather than to obtain information of a confidential nature between attorney and client. Petitioner has not asserted that he has any legal right as a convicted person serving a sentence of confinement to make any telephone calls. No authority has been presented to suggest he might have such a right. The calls were permitted by the institution simply as an accommodation to petitioner. The government suggests that since the mail of a convicted person to his attorney may be examined for reasons of security so also may accommodation telephone ·calls and petitioner's conduct in connection therewith be screened for security and/or medical purposes. There is no showing that petitioner suffered any actual prejudice by what occurred or that he objected to the social worker being stationed where he was. In any event, as the matter stands it is simply one of a few past occurrences which have not resulted in petitioner being deprived of any constitutional right or of being subjected to that type of mistreatment warranting judicial interference in a habeas corpus proceeding.

■ (b) Mail:

Petitioner also testified that the mail correspondence between himself and his attorneys was and is being censored. Consideration of all the evidence convinces that the institution was and is simply asserting its right to check petitioner's incoming and outgoing mail with his attorney for contraband. The Court is not persuaded that there is any misconduct involved. See, Lee v. Tahash, 8th Cir. 1965, 352 F.2d 970.

Parte Hull, 312 U.S. 546, 549, 61 S.Ct. 640, 85 L.Ed. 1034; White v. Ragen, 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed.

■ (c) Visits with Attorney:

Petitioner also complains that on one occasion one of his attorneys came to see him, and that after they had been in conference for approximately an hour and a half, the institutional employees terminated the visit, contrary to petitioner's desire, until after the lunch hour at the institution, some hour and a half later. Petitioner takes the position that if he wished to forego lunch, the institution had no right to interrupt the conference. However, the evidence discloses that the attorney did come back after the lunch period, and did finish the conference with petitioner. Further, the interruption was in accordance with the regular visiting hours permitted. The visiting hours did not include the lunch period. This incident, which aroused so much antagonism in petitioner, illustrates his dogged refusal to abide by or to recognize the reasonableness of certain of the institutional rules and regulations without, in effect, making a scene, or complaints and objections. This incident also illustrates petitioner's efforts to use habeas corpus simply to obtain a review of a past event which upon examination could not possibly be deemed to result in any deprivation of any constitutional right of petitioner. In this regard petitioner has abused the use of the habeas corpus process.

CONTENTION THAT A WRISTWATCH WAS ILLEGALLY OBTAINED FROM PETITIONER

■ While petitioner was away from the Springfield Medical Center, he purchased a wristwatch, which he had with him a' the time he was incarcerated in the Jackson County, Missouri, jail, at Kansas City. When the United States marshals thereafter transported him from the Jackson County jail to Springfield, Missouri, this wristwatch, along with his other property, was placed in a sealed envelope, and delivered to the proper authorities at Springfield Medical Cen-

1348; DeWitt v. Pail, 9 Cir., 366 F.2d 682.

er. The Medical Center deemed the wristwatch to be "contraband", because it had not been obtained in the commissary of the Medical Center. The testimony of the institution's witness was that this wristwatch, along with other contraband property and surplus items, was sent to petitioner's wife, at petitioner's home in New Jersey. However, Mrs. Konigsberg testified that she never received the watch. No one seems to know why the watch was not received, or what has happened to it. The institutional policy of treating as "contraband" items which inmates obtain from some source other than the institutional commissary, and hence either an unknown or uncontrolled source, is one which lies within the power and authority of the institution to have. This policy, bearing some security aspects as well as administration aspects, is not one committed to the judiciary for review or for administration. Therefore, there was no denial of any constitutional or legal right of petitioner involved in the institution requiring that he give up the possession of the watch and permit it to be sent to his home. There is no evidence to indicate that the watch was either stolen or retained by any employee of the institution. What happened to it is speculative at best.

## ILLEGALLY CONFISCATED MONEY CONTENTION

■ A rule of the institution provides that inmates may not have personal possession of money unknown to the institution, but are required to keep their money on deposit with the institution. The institution gives the particular inmate money from his deposit as needed. Although there is considerable fog on the subject it seems quite likely that Mrs. Konigsberg (or someone on her behalf) sent $220.00 to petitioner in a letter that she wrote to him. This letter seemingly went through the usual censoring channels of the institution and eventually came to petitioner with the $220.00 still in it. About the same time, a security search of petitioner's possessions was

made, and $400.00 was found hidden in one of his books. Petitioner was called in and asked about both sums of money. An additional search was made, and an additional $600.00 was located in another book of petitioner's. This $1,220.00 has been retained by the institution. No claim is being made that the institution is entitled to permanently retain this money on a forfeiture basis. While habeas corpus is not the proper remedy for presenting petitioner's contention it is suggested that to avoid other actions the respondents either deposit this money in petitioner's institutional account or return it to Mrs. Konigsberg as petitioner has requested.

## CONTENTION OF LEGAL MATERIALS BEING ILLEGALLY TAKEN

Petitioner testified that he had in his possession a large amount of legal materials, including law books, legal manuscripts, law papers, law notes, a diary, newspapers, newspaper clippings, magazine articles, paper and pencil, and other material that he was using and needed to use in connection with one or more of the approximately eight separate matters which he has in litigation in various courts. He stated that the institutional employees took the majority of that material away from him, lost or destroyed some of it, and sent the remainder to his home. He also contends that they "messed up" much of this material by taking it out of the folders in which he had it, and putting it back in such disorder as to impede his use of it. Evidence on behalf of the institution confirms that the institution, in accordance with its customary security and housekeeping practice, did go through all of the mentioned kinds of material that he had, left what they thought he really needed, and boxed up and sent to his home the remaining material. The testimony makes it clear that the two individuals who undertook to do this on behalf of the institution did not consult with petitioner in any respect in determining what they would

send and what they would permit him to keep, but exercised their own judgment in that respect. It is undisputed that the Medical Center has both regulations and policy that restrict the amount of possessions which any particular inmate may have. Such contain general guide lines as to the number of books, magazines, and so forth, that may be retained at any one time. Evidence on behalf of the institution was to the general effect that care was taken to leave all such material which they thought the petitioner really needed in connection with any of his legal matters, and that it is the practice of the institution not to enforce their possession rule in such a manner as to substantially hamper an inmate in preparing or presenting legal matters.[6]

 The policy of the institution, as explained by the institutional witnesses, is not one which, if reasonably followed, would result in the deprivation of any legal or constitutional right to petitioner.[7] However, it is apparent in this case that there would be no basis for the present complaint if the petitioner had been consulted at least to some extent concerning the respective value of certain of the information, and had been permitted to suggest which items he could get along without. This is so even though petitioner had accumulated such a mass of material that under the institution's rules and policy some of it should be removed and sent to his home. Meaningful consultation eliminates the risk of an institutional employee disposing of a valuable exhibit or other document needed by the inmate in pending litigation. Petitioner's right to present and prepare legal matters is one which he must exercise in a reasonable manner, and within the institution's rules concerning inmates' possessions. There is no persuasive evidence that the institution's actions have in fact deprived the petitioner of effective access to any court, or that it has done any more than to cause him some extra work and loss of working time. The institution in its rules fully recognizes an inmate's right to counsel and to access to the courts. Its policy has been not to infringe on such right.[8] A more reasonable application of the institution's rules and policy with regard to an inmate who has perhaps six separate matters in litigation or in various stages of preparation for litigation, and a more cooperative approach on the part of the inmate, should result in this type of problem not arising in the future. As viewed in its entirety, and in the absence of demonstrated prejudice of substance, it is clear that petitioner has not been denied any constitutional right of access to any court or to counsel.

## CONTENTION OF FALSIFYING RECORDS

 Petitioner also contended that the government had falsified one or more of his records. However, there is a total failure of proof in that regard.

## CONTENTION OF INADEQUATE AND UNCLEAN FOOD

 Petitioner contends that upon occasion he has been denied adequate

---

6. In Hatfield v. Bailleaux, 9 Cir., 290 F.2d 632, the court took up the question of regulations limiting access to legal library, legal books and documents and stated, loc. cit. 640, "If the purpose was not to hamper inmates in giving reasonable access to the courts with regard to their respective criminal matters, and if the regulations and practices do not interfere with such reasonable access, our inquiry is at an end. The fact, if it be a fact, that access could have been further facilitated without impairing effective prison administration is likewise immaterial."

7. In Lanza v. State of New York, 370 U.S. 139, 143, 82 S.Ct. 1218, 1221, 8 L. Ed.2d 384, the Supreme Court ruled a public jail is not the equivalent of a man's house so as to give constitutional immunity from searches and seizures. "In prison, official surveillance has traditionally been the order of the day," absent relationships which the law has endowed with particular confidentiality.

8. See Clements v. Ciccone, W.D.Mo., 285 F.Supp. 196 (1967).

food and has been given unclean food. This contention centers around the time that he was kept in the "strip cell" area. This area consists of 39 closed front cells, with a solid door, except for four window panes in the upper panel. At mealtime according to petitioner it is the institutional practice to carry the food to the area and place it on the floor in front of each occupied cell door. Upon occasion this means that a substantial number of plates will be so placed. After they have been so placed, the guard opens each cell door, one at a time, and hands the inmate his plate of food. Petitioner contends that while the plate of food is on the floor, awaiting this final process, it becomes cold, dust is stirred up on it by the guard walking along, and it is exposed to cockroaches. He claims that upon three occasions he actually saw a cockroach on a portion of the food. Because of his opposition to this method of service, he went on a hunger strike and refused to eat any of the food so served.[9] Other inmates similarly served ate the food without complaint. Taking into consideration all of petitioner's testimony and courtroom conduct it is the court's view that petitioner has exaggerated the dust and bug situation. Even so, the institution would be exercising good judgment by studying the service problem to determine whether or not it does result in unnecessarily exposing the food to dust and bugs. However, the facts presented do not rise to a sufficient status of ill treatment to authorize judicial interference. Petitioner indicated that the maximum time, upon occasion, that any particular plate might be left on the floor is from 12 to 15 minutes. The description of the service performed and other evidence would indicate a lesser time.

## CONTENTION REGARDING WATER

 Petitioner also contends that when in the 10–B unit he is deprived of adequate water. He testified that during the course of the day he was given six cups of water. Other testimony indicated that upon request to hospital personnel, who customarily made the rounds every half hour, he could have obtained additional water. Based upon the Court's observation of petitioner in the courtroom over an eight-day period, it is obvious that he is an individual who drinks considerable water. He drank water in the courtroom in substantial amounts each day that he was in court. The evidence fails to persuade that petitioner while confined in the 10–B unit was deprived of water to such an extent that it affected his health adversely, or caused any appreciable discomfort, or that he endeavored to get additional water by appropriate request. The incident is one of past events not likely to recur, and not amounting to any type of mistreatment that would justify habeas corpus relief.

## CONTENTION THAT PETITIONER WAS TRANSPORTED FROM THE SPRINGFIELD MEDICAL CENTER VIA SEVERAL JAILS TO NEW YORK, INCOGNITO, UNDER A FALSE NAME AND WITH REFUSAL TO PERMIT HIS ATTORNEY AND FAMILY TO KNOW WHERE HE WAS DURING THE COURSE OF SUCH TRIP IN ORDER TO INDUCE HIM TO GIVE TESTIMONY BEFORE A STATE GRAND JURY CONCERNING ILLEGAL ACTIVITIES OF OTHER PERSONS

 The government stipulated with petitioner that under the false name "Ronald Webb" he was transferred from the Medical Center to New York and back via certain overnight stops in jail-

---

9. Other evidence indicates petitioner is quite finicky about food, and unless both the food and service suit him he may resort to "hunger strikes" in which he eats only food or candy that he purchases from the commissary with the ample funds which he appears to always have.

type facilities, and that during all of the time he was so en route going both to and from, he was not permitted to contact any person, including his attorney and his wife. The Medical Center and the United States Marshal's office take the position that this is good security practice in certain instances, so as to be able to take convicted persons on trips safely. The general practice of transporting a prisoner in such a manner as to not permit others to know his exact time of travel or his particular location at any time, where done expeditiously, does have sufficient security basis to make it a matter not subject to court intervention. The use of a false or different name, where done as a part of the security considerations, likewise is not a matter which would justify judicial interference. Nor is there anything per se wrong with reasonable encouragement of any prisoner or other inmate, on a voluntary basis, to give grand jury testimony, with full protection to such inmate as to his right to counsel and to remain silent. Although petitioner was not permitted to have visitors while in New York hopefully to testify before the grand jury, petitioner did not testify before the grand jury, gave no statements, and was eventually returned to the Medical Center pursuant to court order. The incident, insofar as habeas corpus considerations are involved, is simply a past event, unlikely to recur, and not at this time requiring judicial intervention through habeas corpus.

CONTENTION THAT PETITIONER WAS CAUSED TO APPEAR BEFORE A NEW YORK GRAND JURY TO CIRCUMVENT THIS HEARING

Petitioner contends that his removal, described above, from the Medical Center in the fall of 1967, allegedly to appear before a federal grand jury, was in fact, to circumvent a hearing on his present petition in this Court. However, what little evidence there is on the subject indicates that the federal grand jury in New York did in fact want petitioner to appear and testify concerning information which they believed he possessed, and that this was the purpose of requesting his appearance in New York, rather than any purpose of affecting or circumventing the present hearing. His trip to New York was pursuant to the order of this Court, and there has been no attack on the validity of the court order.

CONTENTIONS REGARDING PETITIONER'S CERTIFICATION

Petitioner was certified under authority of Title 18, U.S.C., Section 4241, on November 16, 1965, and confined in the Springfield Medical Center. He was not decertified until approximately August 16, 1967. Petitioner was made available to the New York state authorities on a writ of habeas corpus ad prosequndum for trial in the New York State Court on a state charge that resulted in his conviction and sentence to a term of 33–40 years.[1] Petitioner contends his "release"[2] to the New York State authorities on the writ was an illegal action vitiating his state court conviction and sentence. Petitioner relies on the provisions of 18 U.S.C. § 4241 to prevent the transfer prior to a decertification of a prisoner from the Medical Center where he is committed.

Title 18 U.S.C. § 4085 provides for the transfer of a federal prisoner to a state if he has been indicted by that state. Generally the prisoner has no valid objection because of such transfer. See, Chapman v. Scott, 2 Cir., 10 F.2d 156, aff. 10 F.2d 690, cert. den. 270 U.S. 657, 46 S.Ct. 354, 70 L.Ed.

1. See, Barber v. Page, Warden, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (April 23, 1968); Gilmore v. United States, 10 Cir., 129 F.2d 199; United States v. McGaha, D.C., 205 F.Supp. 949.

2. The evidence indicates petitioner was not actually "released" but rather was housed under federal authority as a federal prisoner and was accompanied by a federal marshal at all pertinent times. At the close of the trial he was returned to the Federal Medical Center at Springfield.

784; Boyce v. United States, D.C., 52 F.Supp. 115. Such "transfer" or release is not considered to result in the loss of federal jurisdiction. De Maris v. United States, D.C., 187 F.Supp. 273; Murray v. United States, 9 Cir., 334 F.2d 616, cert. den. 380 U.S. 917, 85 S.Ct. 906, 13 L.Ed.2d 802; Pigg v. Patterson, 10 Cir., 370 F.2d 101; Stillwell v. Looney, 10 Cir., 207 F.2d 359; Ponzi v. Fessenden, 258 U.S. 254, 42 S.Ct. 309, 66 S.Ct. 607.

 It is the Court's view that petitioner's urged construction of Section 4241 is unrealistic and one not intended by Congress. . There are many instances that might require a prisoner held under Section 4241 to be taken from the Medical Center where he is confined to some other place. It might be necessary so he can be a witness, or prosecute his own complaint in court, or be prosecuted, if he is mentally sufficient for such purpose. A reasonable reading of Section 4241 does not result in it conflicting with Section 4085 of Title 18 U.S.C.

Petitioner argues the Attorney General did not consent to his removal to New York and thus the requirements of Section 4085 were not complied with. Exhibit P-24 is a telegram over the signature of C. R. Hagan, Assistant Director of the Bureau of Prisons directing that Konigsberg be taken by the United States marshals to New York and authorizing the Director at the Springfield Medical Center to honor the New York State Writ of Habeas Corpus ad prosequendum. The Bureau of Prisons is "subject to the general supervision and direction of the Attorney General", 28 C.F.R. § 0.95. Under that direction and supervision the Director of the Bureau of Prisons directs all activities of the Bureau of Prisons, including "management and regulation of all Federal penal and correctional institutions," providing "suitable quarters for, and safekeeping, care, and subsistence of, all persons charged with or convicted of offenses against the United States," and the like. 28 C.F.R. § 0.95(a), (b). Specifically, and by way of delegation, the Director

of the Bureau of Prisons "is authorized to exercise or perform any of the authority, functions, or duties conferred or imposed upon the Attorney General by any law relating to the commitment, control, or treatment of persons (including insane prisoners and juvenile delinquents) charged with or convicted of offenses against the United States, including the taking of final action in the following described matters: * * * (c) designating places of confinement where the sentences of prisoners * * * shall be served, and ordering transfers from one institution to another whether maintained by the Federal Government or otherwise * * * (d) designation of agents for the transportation of prisoners." 28 C.F.R. § 0.96. Redelegation by the Director of the Bureau of Prisons to any of his subordinates in this regard is expressly provided for in 28 C.F.R. § 0.97.

 There is no indication that the direction from the Assistant Director of the Bureau of Prisons to honor the New York writ of habeas corpus was made other than in the ordinary course of prison administration or that it was not fully authorized by the statutes and regulations. Petitioner's contention, based as it is on the contention that the Attorney General personally had to authorize the transfer, is without merit.

### CONTENTIONS ON REOPENED HEARING

Petitioner contends that on his arrival at the Springfield Medical Center on March 18, 1968, he was again beaten and otherwise mistreated as set out in his Application to Re-open Hearing.

 Based on the evidence adduced at the reopened hearing, petitioner's contentions are found to be without merit and without credible factual support. It is clear that on his return on March 18, 1968, to the Medical Center he was again required, per institutional rules, to submit to a search for contraband. He refused to permit an exterior visual inspection of the buttocks area unless it was conducted by a doctor. He testi-

fied (for the first time) he would not object to such an inspection by a non-medical person if it were one that he respected. As a result of his refusal the inspection was made by force. He was not beaten. Nor was he subjected to cruel and inhuman punishment. What has been said herein above concerning the right of the institutional personnel to require such external visual inspection is again applicable. Contention (2) (g) is that the Adverse Behavior Committee is threatening to deprive petitioner of all the balance of his good time accrued. According to the evidence he has been deprived of it. There is no credible evidence to support a conclusion that the action of the committee was arbitrary and its action is not such as to empower this Court to intervene. Nor do the facts presented justify resort to habeas corpus by petitioner.

CONCLUSION:

Respondent Ciccone is directed to take such action as is specifically ordered in this opinion concerning petitioner's desire to attend religious services. In all other respects, the writ is denied.