Danny BRENNEMAN et al., Plaintiffs,

v.

Frank I. MADIGAN et al., Defendants.

No. C–70 1911.

United States District Court,
N. D. California.

May 12, 1972.

Richard Berg, Legal Aid Society of Alameda County, Oakland, Cal., for plaintiffs.

Richard J. Moore, County Counsel, Thomas J. Fennone, Kelvin H. Booty, Jr., Deputy County Counsels, Oakland, Cal., for defendants.

## MEMORANDUM OPINION

ZIRPOLI, District Judge.

On September 8, 1970, five named plaintiffs filed this civil rights action on behalf of themselves and all others incarcerated in the Greystone section of the Santa Rita Rehabilitation Center, one of Alameda County's jail facilities, while awaiting trial. The complaint alleges that plaintiffs, and the class they represent, are confined solely because they are unable to post bail; yet even as pre-trial detainees, presumed innocent of the charges against them, they nonetheless suffer cruel and unusual punishment in violation, *inter alia*, of their rights to due process and equal protection of the laws secured by the Fourteenth Amendment to the Constitution of the United States. The named defendants are the Sheriff and the members of the Board of Supervisors of Alameda County. The court has jurisdiction under 28 U.S.C. §§ 1343(3), 2201, 2202 and 42 U.S.C. § 1983.

This case raises two fundamental issues. The first issue, plaintiffs' claim that they could not be subjected to cruel and unusual punishment, initially provided the dramatic focus for the court's inquiry into the prevailing practices and procedures at the county jail. However, the second issue, plaintiffs' claim that they could not be subjected to any punishment whatsoever, ultimately determined the course of this litigation and the scope of the strategic confrontation between the parties. In the interest of clarity, the court will discuss these issues in the order they arose.

■■ The federal courts do not sit to superintend the administration of the county jail system; but what they do sit to do, and what they must do, is insure that those who administer that system comply with the requirements of the Constitution: The duty to confront and resolve constitutional questions, regardless of their difficulty or magnitude, is the very essence of the judicial responsibility. While the federal courts must be

sensitive to the problems created by unwarranted judicial interference with the administration of state penal institutions, Smith v. Schneckloth, 414 F.2d 680 (9th Cir. 1969); Walker v. Blackwell, 360 F.2d 66 (5th Cir. 1966); Walker v. Pate, 356 F.2d 502 (7th Cir.), cert. denied 384 U.S. 966, 86 S.Ct. 1598, 16 L.Ed.2d 678 (1966), when questions of constitutional dimension arise, the courts cannot simply abdicate their function out of misplaced deference to some sort of "hands off" doctrine. *See, e. g.,* Barnett v. Rodgers, 133 U.S.App. D.C. 296, 410 F.2d 995 (1969); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1969); Wright v. McMann, 387 F.2d 519 (2d Cir. 1967); Rivers v. Royster, 360 F.2d 592 (4th Cir. 1966). "We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication . . . ." Stapleton v. Mitchell, 60 F.Supp. 51, 55 (D.Kan.1945), quoted with approval in Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), and McNeese v. Board of Education, 373 U. S. 688, 674 n. 6, 83 S.Ct. 1433, 10 L.Ed. 2d 622 (1963).

■ "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Notwithstanding that imprisonment may deprive the convict of certain rights which would otherwise be his to enjoy, "A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L. Ed. 2001 (1945); Sewell v. Pegelow, 291 F.2d 196, 198 (4th Cir. 1961). Thus, it has long been recognized that imprisonment cannot deprive him of the protection of the due process and equal protection clauses of the Fourteenth Amendment.

"[I]t is well established that prisoners do not lose all their constitutional rights and that the Due Process and Equal Protection Clauses of the Fourteenth Amendment follow them into prison and protect them there from unconstitutional action on the part of prison authorities carried out under color of state law." Washington v. Lee, 263 F.Supp. 327, 331 (M.D.Ala. 1966), aff'd per curiam 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). See also Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Dowd v. Cook, 340 U.S. 206, 71 S.Ct. 262, 95 L.Ed. 215 (1951); Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L. Ed. 1034 (1941).

In appraising the sufficiency of civil rights complaints from state prisoners that challenge the conditions of confinement, the courts have tried to discriminate between matters of administration which are appropriately committed to the discretion of custodial personnel and issues of constitutional dimension which are properly amenable to judicial intervention. Conceptually, such complaints, and the judicial responses they provoke, fall into three broad categories.

■■ As a rule, the courts uniformly refrain from considering challenges to routine administrative assignments. Certainly confinement of a prisoner in one section of a prison instead of another, Hanvey v. Pinto, 441 F.2d 1154, 1155 (3d Cir. 1971); Gray v. Creamer, 329 F.Supp. 418, 420 (W.D.Pa.1971), or in one institution instead of another, United States ex rel. Stuart v. Yeager, 293 F.Supp. 1079 (D.N.J.1968), aff'd 419 F. 2d 126 (3d Cir.), cert. denied 397 U.S. 1055, 90 S.Ct. 1400, 25 L.Ed.2d 673 (1969); Lewis v. Gladden, 230 F.Supp. 786 (D.Or.1964); Siegel v. Ragen, 180 F.2d 785 (7th Cir.), cert. denied 339 U. S. 990, 70 S.Ct. 1015, 94 L.Ed. 1391, rehearing denied 340 U.S. 847, 71 S.Ct. 12, 95 L.Ed. 621 (1950), does not ordinarily violate any constitutional right. Institutional placement in the nature of classification is peculiarly within the competence of prison officials, and the courts

do not interfere absent unusual circumstances. *But see* Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970).

■■ Recent challenges to confinement than the prison population suffers generally have split the courts. Some courts take the position that punitive confinement, whether or not it is labelled as "punishment," requires some semblance of due process. *See, e. g.,* Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971); Nolan v. Scafati, 430 F.2d 548, 550 (1st Cir. 1970); Howard v. Smyth, 365 F.2d 428, 429–430 (4th Cir.), cert. denied 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966). *See also* Urbano v. McCorkle, 334 F.Supp. 161 (D.N.J.1971); Landman v. Royster, 333 F.Supp. 621 (E.D. Va.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971); Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971); Carter v. McGinnis, 320 F.Supp. 1092 (W.D.N.Y.1970); Smoake v. Fritz, 320 F.Supp. 609 (S.D.N.Y.1970); Kritsky v. McGinnis, 313 F.Supp. 1247 (N.D.N.Y. 1970). Other courts flatly refuse to subject prison disciplinary proceedings to judicial scrutiny in the absence of extraordinary circumstances. *See, e. g.,* Young v. Wainwright, 449 F.2d 338 (5th Cir. 1971); Burns v. Swenson, 430 F.2d 711 (8th Cir. 1970); Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969); United States ex rel. Knight v. Ragen, 337 F.2d 425 (7th Cir. 1964). Most recent cases, even those denying relief, at least implicitly recognize the principle that rudimentary due process requires the authorities to confront the prisoner with an accusation, inform him of the evidence against him, and afford him a reasonable opportunity to present his version of the facts. *See, e. g.,* Tyree v. Fitzpatrick, 325 F.Supp. 554 (D.Mass. 1971), aff'd 445 F.2d 627 (8th Cir. 1971). Although the courts must accord prison officials considerable latitude in matters of internal discipline, the courts must also endeavor to distinguish mere matters of discipline from arbitrary and capricious disregard of human rights. Even convicted criminals cannot be constitutionally subjected to a regime under which their rights are dependent on the actions of prison officials wholly unaccountable in the exercise of their power.

■ The courts are unanimous in providing a federal forum for attacks on conditions of confinement alleged to violate the explicit constitutional mandate against cruel and unusual punishment. In our own times, the courts have not hesitated to import the Eighth Amendment into the prison context to vindicate those civilized standards of humanity and decency which circumscribe the power of the State to punish those who transgress its laws. *See, e. g.,* Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y. 1970); Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn.1969); Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962). Although the Supreme Court has not detailed the scope of the proscription against cruel and unusual punishment, which applies to the states through the due process clause of the Fourteenth Amendment, Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), it has observed that "the basic concept underlying the Eighth Amendment is nothing less than the dignity of man." Certainly its scope is not static; rather, it "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 100–101, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958).

■ The initial thrust of this case was the plaintiffs' complaint that the conditions of their confinement violated the Eighth Amendment. Because the content of what may be called, for want of a better phrase, the reality of confinement is so elusive, the court visited Santa Rita on March 10, 1971 to acquire some perspective on plaintiffs' claim that the conditions of confinement in Greystone were "cruel and unusual" and defendants' rejoinder that while some of those conditions were perhaps regrettable, such privations as the plaintiff class suffered were in some sense inevitable consequences of custody. After making that visit, the court concluded that the

conditions at Greystone were truly deplorable. The shocking and debasing conditions which prevailed there constituted cruel and unusual punishment for man or beast as a matter of law. At that time, the court's inescapable conclusion was that Greystone should be razed to the ground.

What the court saw when it visited Greystone violated basic standards of human decency, not some mere "fastidious squeamishness or private sentimentalism," Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and shocked the conscience of the court. The inmates confined in Greystone were locked up in tiny, drably painted cells, and confined to those cells and the society of their cellmates, virtually 24 hours a day, seven days a week, utterly without opportunity for recreation, exercise, vocational training, education, work or any other activity or diversion, with the exception of those few brief periods each week, amounting to no more than a total of two hours, when they were released to shower and shave or to visit with friends and relatives. The heating, ventilation, plumbing and sanitation were obviously and grossly substandard. To say that the conditions of confinement under these circumstances were rigorous and uncomfortable is to put it mildly. Whatever necessity compels the rigor and discomfort, there are limits which the State may not constitutionally exceed. Those limits were exceeded here.

 The subhuman conditions the court discovered at Greystone could not help but destroy the spirit and threaten the sanity of the men who had to endure them. In such circumstances, the courts must act immediately to enforce the mandates of the Constitution. In Jordan v. Fitzharris, 257 F.Supp. 674, 680 (N.D.Cal.1966), Chief Judge (now Senior Judge) Harris declared:

"[W]hen, as it appears in the case at bar, the responsible prison authorities . . . have abandoned elemental concepts of decency by permitting conditions to prevail of a shocking and debased nature, then the courts must intervene—and intervene promptly—to restore the primal rules of a civilized community in accord with the mandate of the Constitution of the United States."

Of course, this is true even if those conditions amount to no more than the conditions of confinement for the entire population of a penal institution rather than disciplinary measures directed at a single inmate which may be specifically labelled as "punishment."

"In the Court's estimation confinement itself within a given institution may amount to a cruel and unusual punishment prohibited by the Constitution where the confinement is characterized by conditions and practices so bad as to be shocking to the conscience of reasonably civilized people even though a particular inmate may never personally be subject to any disciplinary action." Holt v. Sarver, 309 F.Supp. 362, 372–373 (E. D.Ark.1970), aff'd 442 F.2d 304 (8th Cir.1971).

See also Jackson v. Bishop, 404 F.2d 571, 580–581 (8th Cir. 1968).

On March 11, 1971, the court instructed the defendants in open court to take whatever steps were necessary to alleviate the cruel and unusual conditions of confinement then prevailing at Greystone. During the past year the defendants have made regular reports on their efforts to comply with the court's order, and the court is impressed with the commendable progress which has already been made. However, more needs to be done. Before considering any further limitations on the conditions of confinement, which derive from plaintiffs' status as pre-trial detainees, it is appropriate for the court to describe the present conditions at Santa Rita generally, and at Greystone in particular. The parties have agreed and stipulated to the following facts:

Most of the Santa Rita facility consists of barracks in what is designated the

"Compound," a minimum security unit. The bulk of the convicted and sentenced inmates at Santa Rita are housed in these barracks. Some of these barracks are referred to as "Little Greystone," a medium security unit. Pre-trial detainees may be housed here or in "Greystone" itself, a maximum security building. Pre-trial detainees are initially placed in the Courthouse Jail, Alameda County's other maximum security jail facility, Greystone's East Wing, or Little Greystone on the basis of such criteria as the seriousness of the charges, the amount of bail, and any past experience of jail personnel with the detainee. Reduction of bail or charges may result in the transfer of a detainee to a less restrictive unit; various factors, including misbehavior or the need for protective custody, may result in a transfer to a more restrictive unit. As a rule, convicted and sentenced inmates, including those who may have been incarcerated in Greystone before conviction, are initially placed in the Compound. Various factors, including misbehavior or the need for protective custody, may result in a transfer to a more restrictive unit. Aside from application of these classification standards, there is no diagnostic procedure or interview on intake for either pre-trial detainees or convicted and sentenced inmates.

Generally, only sentenced inmates are housed in the Compound. The opportunities for recreation and exercise are diverse. The grounds surrounding the barracks are "free exercise" areas. During certain hours, an auditorium, a gymnasium and weight-lifting room, several basketball courts, a horse shoe pit, an athletic field, and assorted sports equipment are available to Compound inmates. Thre are two color television sets in the auditorium; movies are screened weekly and on holidays. The Compound also offers vocational training and education programs. Inmates have daily access to a library and reading room and weekly access to a "book mobile." There is a formal education program jointly sponsored by the Sheriff and the local high school district. In addition, inmates on the Compound are assigned to suitable work to learn skills and to operate the institution. There is on-the-job vocational training in the bakery, the dining hall, the carpentry and machine shops, the farm and the laundry. (The defendants are committed to constructing and operating a "work-furlough" facility, but there is no present or planned "study-release" program.) Compound inmates may attend religious services during the week and on weekends in the chapel. They receive visitors in the auditorium, seated at a table across from the visitor, during regular visiting hours, Sundays from 11:30 a. m. to 2:30 p. m. Compound inmates take all meals in a common mess hall.

The Greystone facility consists of two connected buildings, referred to as East Greystone and West Greystone, an exercise yard, eight day rooms, a visiting facility, an interview room, and a medical examination room. Pre-trial detainees are housed in East Greystone; sentenced inmates are housed in West Greystone. *Both pre-trial detainees and sentenced inmates in Greystone are subjected to substantially the same treatment.* The Greystone cells measure 7′ by 7′ and are each fitted with a solid door with a porthole, an overhead wire grating, and an overhead catwalk. Each cell generally contains a toilet, a bunk bed, and a sink with running water for the two inmates who occupy it. Greystone inmates do not have access to recreation and exercise facilities comparable to those available to inmates on the Compound; however, the courtyard does have two basketball backboards and nets. There are no other provisions for recreation and exercise, although Greystone inmates may now spend most of the daylight hours in the exercise yard or the day rooms. Inmates may retain approved personal books, but there is no library, reading room, or access to the "book mobile" and no basic or remedial educational program. There is no vocational training in Greystone,

and no Greystone inmates work outside of Greystone. Pre-trial detainees are not required to work, but they may volunteer to work in Greystone's food service and plant maintenance operations. There are no formal religious services in Greystone. Regular visiting is allowed on Sundays from 11:30 a. m. to 2:30 p. m. for both sentenced inmates and pre-trial detainees. On the whole, Greystone is a maximum security facility, and the movements and activities of both sentenced inmates and pre-trial detainees confined there are restricted accordingly.

Although Little Greystone is not, strictly speaking, a maximum security unit, the regimen is comparable to Greystone. Little Greystone inmates, including both sentenced inmates and pre-trial detainees, are confined to their barracks and the courtyard in the middle of those barracks, except for the three daily meals they take in the main mess hall. Aside from the substantial physical differences in housing, *the treatment of Little Greystone inmates is substantially the same as the treatment of Greystone inmates.* Inmates confined there likewise have no access to the facilities and programs available to the inmates on the Compound.[1]

The court is aware that there have been numerous changes in the physical plant and procedures at Greystone since its visit. Planned construction, some of which has already been completed, includes six new day rooms, two dining rooms with cooking and dishwashing facilities, a new exercise yard, a new visiting facility, and a new medical room. Most importantly, the inmates confined at Greystone now spend substantial portions of each day outside their cells in the day rooms and exercise yard. However, the court is also aware that those improvements which have already been made, as well as those which are planned, are interim in character; the record is replete with evidence that the County of Alameda is on the verge of expensive new construction of county jail facilities. With this fact in mind, it is appropriate for the court to devote considerable attention to what has emerged as the fundamental issue in this case, namely, the rights of pre-trial detainees who are presumed innocent of any crime.

The plaintiff class is composed of pre-trial detainees who are incarcerated pending trial because, unless they are charged with an unbailable offense, they are unable to make bail and unsuitable under present standards for release on their own recognizance. Although the constitutional limitations on the treatment of pre-trial detainees, as

---

1. The preceding description of the general conditions of confinement at Santa Rita is by no means exhaustive. Most conspicuously, it omits data which are crucial to a thorough analysis of the problem and the ultimate development of a workable solution. Although it would be neither appropriate nor feasible for this court to undertake such an analysis or to devise such a solution, even the most cursory glance at the statistics reveals the enormity of the problem facing jail administrators and the magnitude of the responsibility confronting the courts.

The average period of incarceration for sentenced misdemeanants, who compose 90 per cent of the sentenced inmates at Santa Rita, is 23 days; the average for sentenced felons is 120 days. The average period of incarceration for pre-trial detainees accused of felonies, 87 per cent of the detainees in Greystone and 72 per cent of the detainees in Little Greystone, is 67 days; the average for pre-trial detainees accused of misdemeanors is 13 days. The significance of these figures for this case is derived from the demographic data compiled by the California Bureau of Criminal Statistics: On September 29, 1960, there were 24,035 sentenced and unsentenced inmates in California jails. On September 25, 1969, this number had increased to 27,918, the largest jail population in the United States. Nearly half of this population, 12,929, was composed of pre-trial detainees. These statistics are based on a census for *a single day;* the Board of Corrections estimated last year that approximately 1,000,000 persons would be processed through California's jails in 1971. Board of Corrections, Human Relations Agency, California Correctional System Study: Jail Task Force Report 14 (1971).

opposed to convicted prisoners, are not as well established as they might be, it should at least be settled that more is involved than a distinction without a difference. Both classes are incarcerated, yet the purpose of incarceration is fundamentally different: Imprisonment prior to trial is sometimes justified to insure the appearance of the accused at trial; imprisonment after trial is imposed to accomplish the objectives of the criminal law. In Anderson v. Nosser, 438 F.2d 183, 190 (5th Cir. 1971), the Court of Appeals for the Fifth Circuit elaborated on this difference:

> "Incarceration after conviction is imposed to punish, to deter, and to rehabilitate the convict (citation omitted). Some freedom to accomplish these ends must of necessity be afforded prison personnel. Conversely, where incarceration is imposed prior to conviction, deterrence, punishment, and retribution are not legitimate functions of the incarcerating officials. Their role is but a temporary holding operation, and their necessary freedom of action is concomitantly diminished. . . . Punitive measures in such a context are out of harmony with the presumption of innocence."

It is true that any deprivation of liberty is, in reality, a form of punishment; but it is also true that the *only* legitimate purpose of incarcerating those who are accused of crime is to guarantee their presence at trial: "The constitutional authority for the State to distinguish between criminal defendants by freeing those who supply bail pending trial and confining those who do not, furnishes no justification for any additional inequality of treatment beyond that which is inherent in the confinement itself."[2] *See* Stack v. Boyle, 342 U.S. 1, 4, 72 S.Ct. 1, 96 L.Ed. 3 (1951). It certainly furnishes no justification for treating pre-trial detainees as convicted prisoners. Several recent courts have stressed the constitutional implications arising from the failure to appreciate the difference between these two classes of inmates.

In Jones v. Wittenberg, 323 F.Supp. 93, 100 (N.D.Ohio (1971)), the court held that the conditions of confinement for pre-trial detainees in Lucas County Jail violated the due process and equal protection clauses of the Fourteenth Amendment:

> "Obviously, no person may be punished except by due process of law. Here, the evidence shows that at best, those who are in the Lucas County Jail pending trial of charges against them suffer the same treatment as those who are confined there for punishment. Hence, even if that punishment were not cruel and unusual, it would still be proscribed for them, since it is imposed as a matter of form and routine, and without any semblance of due process or fair treatment."

In doing so, the *Jones* court but recognized and reaffirmed the principle that punishment before conviction is anathema to American law.[3] The court in Hamil-

---

2. Butler v. Crumlish, 229 F.Supp. 565, 567 (E.D.Pa.), final injunc. denied on other grounds, 237 F.Supp. 58 (1964). The court is cognizant of the fact that *Butler* has been disapproved by the Third Circuit in United States v. Evans, 359 F.2d 776 (3d Cir. 1966), and Rigney v. Hendrick, 355 F.2d 710 (3d Cir. 1965), cert. denied, 384 U.S. 975, 86 S.Ct. 1868, 16 L.Ed. 2d 685 (1966). In all three cases, however, the courts were considering the constitutionality of requiring an unbailed defendant to participate in a compulsory line-up when a bailed defendant could be required to participate only if he were first arrested and charged with the specific crimes for which he was to be viewed.

The court of appeals justified its approval of that practice by referring to the practical demands of effective criminal investigation. To the extent that the court thereby implicitly declined to recognize the right of a pre-trial detainee to suffer no restrictions except those necessitated by his confinement, this court cannot agree.

3. Imprisonment prior to trial "is only for safe custody, and not for punishment: therefore, in this dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters, or subjected to other hardships

ton v. Love, 328 F.Supp. 1182, 1191 (E.D.Ark.1971), echoed this conclusion: "Having been convicted of no crime, the detainees [in Pulaski County Jail] should not have to suffer *any* 'punishment', as such, whether 'cruel and unusual' or not." This court adheres to the holdings of these cases. *See also* Seale v. Manson, 326 F.Supp. 1375, 1379 (D. Conn.1971); Davis v. Lindsay, 321 F. Supp. 1134, 1139 (S.D.N.Y.1970); Tyler v. Ciccone, 299 F.Supp. 684, 685, 687 (W.D.Mo.1969).

 Both Jones v. Wittenberg, *supra,* and Hamilton v. Love, *supra,* relied primarily on a due process analysis to support their conclusion. A convicted prisoner is presumed to have been justly convicted and properly sentenced to imprisonment; a pre-trial detainee is presumed innocent in accordance with "that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" In re Winship, 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); Coffin v. United States, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895).[4] Before the State may deprive an individual of his liberty, an "interest of transcending value," *id.* 397 U.S. at 364, 90 S.Ct. 1068, it must comply with the demands of due process. See Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed. 2d 113 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The determination at a bail hearing to deprive a criminal defendant of his liberty in order to assure his presence at trial furnishes no warrant for any loss except loss of liberty. Subjecting a detainee to gratuitous and wholesale deprivation of rights which are unrelated to insuring his presence at trial

offends the requirements of due process of law.

 Due process is a pervasive concept which embodies, even in its most rudimentary form, the notion of fundamental fairness whenever governmental action may result, as it does here, in grievous loss to the individual. What process is due varies with the circumstances, and "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 866, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). *See also* Hannah v. Larche, 363 U.S. 420, 440, 442, 80 S.Ct. 1502, 4 L.Ed. 2d 1307 (1960). Maintaining the security of a population confined against its will in close quarters is unquestionably a legitimate concern, but even under this set of circumstances, some measure of due process is required:

"Rejection of the right-privilege distinction as a sterile form of words has likewise cast doubt upon the logical difference between deprivations constituting 'punishment' and those presented as techniques for the maintenance of 'control' or 'security.' Presumably the consequence of labeling a deprivation a matter of control is that it may be imposed without procedural preliminaries. The distinction is unpersuasive. Substantial deprivations of rights even in matters called civil where no misconduct is alleged have not been permitted without due process. Reasons of security may justify restrictive confinement, but that is not to say that such needs may be determined arbitrarily or without appro-

---

than such as are absolutely requisite for the purpose of confinement only . . . ." 4 W. Blackstone, Commentaries 300, quoted in Jones v. Wittenberg, 323 F.Supp. 93, 100 (N.D.Ohio 1971).

4. Aside from such platitudes, the courts appear to have focused on the specific

content of the presumption of innocence only rarely. For a general survey, see Stump v. Bennett, 398 F.2d 111 (8th Cir. 1968); for a specific application of the presumption, see Hernandez v. Beto, 443 F.2d 634 (5th Cir. 1971).

priate procedures." Landman v. Royster, 333 F.Supp. 621, 645 (E.D. Va.1971).

Whether onerous prison conditions are imposed on pre-trial detainees under the shibboleth of "punishment" or "security," the constitutionality of those conditions is always a proper subject of judicial inquiry.

It is ironic that the conditions of confinement for pretrial detainees at Greystone are markedly worse than the conditions of confinement for convicted prisoners serving their sentences, either on the Compound at Santa Rita or in State prison. Even assuming those conditions no longer amount to cruel and unusual punishment, jail administrators are not simply free to disregard the fact that pre-trial detainees are not convicted criminals. To paraphrase Covington v. Harris, 136 U.S.App.D.C. 35, 419 F.2d 617, 623 (1969), the principle of the least restrictive alternative consistent with the purposes of a commitment inheres in the very nature of pre-trial confinement which entails an extraordinary deprivation of liberty justifiable only when the detainee is unable to make bail. To be sure, the State's interest in insuring the presentment of an accused for trial is weighty, but "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

An equal protection analysis leads as inexorably to the identical conclusion. For purposes of confinement, the County of Alameda has placed pre-trial detainees in a class with those persons sentenced to jail following conviction of a crime. Yet since those persons are presumed to be guilty, and are accordingly subjected to mandatory punitive, rehabilitative and deterrent sanctions, it is unreasonable to classify detainees with them for purposes of determining the conditions of confinement. Rather, pre-trial detainees are part of a class of arrested persons in whom the State's only legitimate interest is to insure presence at trial. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1951), establishes that any deprivation of fundamental rights incident to criminal prosecutions which is based on poverty violates the equal protection clause. Therefore, incursions on the rights of a pre-trial detainee, other than those arising from the need for custody (instead of bail) to insure his presence at trial, are unconstitutional. Except for the right to come and go as he pleases, a pre-trial detainee retains all of the rights of a bailee, and his rights may not be ignored because it is expedient or economical to do so. Any restrictions and deprivations of those rights, beyond those which inhere in the confinement itself, must be justified by a compelling necessity, Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), arising from the dearth of alternatives, Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971); Williams v. Illinois, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970).[5]

5. Several recent cases deserve mention in this context. In Ackies v. Purdy, 322 F. Supp. 38 (S.D.Fla.1970), the court voided the use of master bond schedules on both due process and equal protection grounds in a case which raised substantially similar issues as the case now before this court. The Supreme Court had an opportunity to consider the equal protection issue in McDonald v. Board of Election Commissioners, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), but resolved the question before it on the rather narrow ground that failure to accord pre-trial detainees absentee ballots, which the Court termed a remedial privilege, did not necessarily establish an unreasonable classification in violation of the Fourteenth Amendment. It is worthy of note that the Court did not explicitly compare detainees with bailees.

Although it may be limited by compelling necessity, "the extent of the constitutional guaranty is not fixed by the administrators' budget or imagination." Landman v. Royster, 333 F.Supp. 621, 648 (E.D.Va.1971). The court is aware that according pre-trial detainees those rights to which they are constitutionally entitled will entail additional expenditures of available resources. Notwithstanding the legitimacy of this concern, the present existence of deficiencies in staff, facilities, and finances cannot excuse indefinitely depriving pre-trial detainees of the maximum enjoyment of the rights accorded to all citizens who are unconvicted of any crime.

"In one sense, the argument [of jail administrators] is substantial; providing a normal civilian life for detainees would mean providing so many facilities, services and personnel that it would create an intolerable burden on the resources of the state. In another sense, however, the argument is preposterous; . . . If the level of resources is always taken as given, it can justify anything—even depriving detainees to the point of starving them, were the level lower." Note, "Constitutional Limitations on the Conditions of Pretrial Detention," 79 Yale L.J. 941, 955 (1970).

Several courts have considered and rejected the claims of the State that inadequate resources excuse unconstitutional practices or procedures. This court also adheres to the view that, "Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . . ." Jackson v. Bishop, *supra*, 404 F.2d at 580. *See also* Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451, 457 (1966). In operating existing facilities and in constructing new ones, the County of Alameda must recognize that any restrictions on the liberties of pre-trial detainees, beyond those arising from their confinement itself, cannot be justified simply because the County chooses not to allocate the funds to relieve them. To put the point baldly, "Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights. If the state cannot obtain the resources to detain persons awaiting trial in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons." Hamilton v. Love, 328 F.Supp. 1182, 1194 (E.D. Ark.1971).[6]

Equally unpersuasive as a justification for violating the rights of pre-trial detainees is the notion that it is more expedient, in terms of the practicalities of administering the jail, to treat pre-trial detainees as if they were convicted prisoners. The court entertains no doubt that it is. But the county may not run roughshod over the rights of a pre-trial detainee because it is expedient to do so. So long as pre-trial detainees are confined in obsolete jail facilities, it will undoubtedly continue to be expedient to subject them to whatever conditions of confinement are inflicted on convicted prisoners. This court cannot conclude, however, that the Constitution permits expedience to sanction such a ruthless consequence. Vindication of constitutional rights cannot be made dependent on any theory that it is less expensive or more expedient to deny them than to afford them.

At least until such time as Alameda County constructs a suitable facility for pre-trial detainees, the court realizes that there are compelling circumstances which do justify certain restrictions on their rights. This court does not expect jail administrators to devise and implement practices and procedures

---

6. *Cf.* Holt v. Sarver, 309 F.Supp. 362, 385 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1971): "[T]he obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States."

requiring custodial personnel to countenance behavior which poses a clear danger to jail security or fosters significant breaches of prison discipline or constitutes substantial interference with orderly institutional administration. But the court's recognition of these interests does not confer carte blanche on the defendants to justify every restriction and deprivation by invoking the rubric of "security" or "discipline." Rather, it attempts to strike a balance between the legitimate demands of pre-trial detainees for the unfettered enjoyment of those rights which they should possess as persons unconvicted of any crime and the compelling custodial necessities of jail administration.[7]

Unquestionably, pre-trial detainees who are accused of serious crimes must be confined in secure facilities. Holding them continuously in cells is unquestionably an expedient method of insuring security, but such oppressive confinement is not the least restrictive alternative available to the defendants for maintaining jail security. What is required are large secured areas, both indoors and out, which substitute close supervision for close confinement. Moreover, regardless of their presumed innocence, certain pre-trial detainees may be troublesome disciplinary problems. Jail personnel may segregate these inmates, but they must establish and apply appropriate standards for doing so. They may not avoid disciplinary problems altogether by subjecting pre-trial detainees as a class to the regimen which is prescribed for convicted inmates who are being punished. Finally, respecting the rights of pre-trial detainees does not mean that jail administrators may not restrict the exercise of those rights which would substantially interfere with the operation of the institution. Such limitations must be imposed only because of necessity, however, not as a matter of administrative convenience or routine. Aside from those restrictions which are absolutely necessary to serve one of these legitimate purposes (none of which derives from punitive, rehabilitative or deterrent rationales), pre-trial detainees should not suffer any other privations or hardships.

This court cannot review the practices and procedures now prevailing at the Greystone facilities in detail. Although the court anticipates that the defendants will act diligently and in good faith to conform the treatment of pre-trial detainees to constitutional requirements, both in administering existing facilities and in planning new ones, it may be helpful at this juncture for the court to make some specific observations.

Simply because the defendants cannot require pre-trial detainees to work or to participate in vocational training or education classes, the defendants cannot therefore condemn the class of pre-trial detainees to days of enforced idleness. The record establishes that the majority of pre-trial detainees in Greystone are incarcerated, on an average, nearly three times as long as the majority of convicted misdemeanants on the Compound. During that period of confinement, pre-trial detainees should at least have opportunities to participate in educational, vocational and recreational programs comparable to those available on the Compound. If a pre-trial detainee chooses not to avail himself of those opportunities, there must be recreational alternatives. Certainly it is difficult to conceive of a compelling necessity to deny the plaintiff class liberal access to a basic library of books, magazines and newspapers. Merely because all such resources may be labelled "rehabilitative" in other institutional contexts does not justify denying them to pre-trial detainees.

7. "Only a compelling state interest centering about prison security, or a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration can justify curtailment of a prisoner's constitutional rights." Fortune Society v. McGinnis, 319 F.Supp. 901, 904 (S.D.N.Y.1970).

■■ The plaintiff class also has a constitutional right, protected by the First Amendment, to communicate with friends, relatives, attorneys and public officials by means of visits, correspondence and telephone calls.[8] Visiting at Greystone now occurs in the new visiting facility where the inmate and his visitor are seated and, separated by a glass partition, talk by telephone. Most visits are approximately 15 minutes long, but there is no fixed time limit; any time limit is a function of the number of visitors, the availability of visiting spaces, and the length of the visiting period. Although unrestricted visiting might constitute an intolerable interference with orderly jail administration, pre-trial detainees should be able to visit with friends and relatives for more than 15 minutes once a week. In Jones v. Wittenberg, 330 F.Supp. 707, 717 (N.D. Ohio 1971), the court required the establishment of a visiting program "which shall include daily visiting hours, both in the daytime and in the evening, and especially upon holidays and weekends; the provision of much more adequate physical facilities for visitation; removal of the limitations on visits by children and by persons not members of the prisoner's immediate family; and provisions for limitation or removal of visiting privileges for disciplinary purposes, or for abuse of visiting privileges." The scope of this directive seems unobjectionable. No compelling reason appears to the court why a pre-trial detainee may list only five "authorized" visitors over the age of 14 as

Greystone's rules of conduct now provide. As a general proposition, a pre-trial detainee should be able to visit with whomever he pleases, especially his children, for substantial periods of time each week.

Greystone inmates may always make such telephone calls as are provided for in the California Penal Code or by court order. Inmates may sometimes make other calls as well, placed on a collect basis by a deputy who may also monitor the call by remaining present during the conversation. While a convicted prisoner may have no right to make any telephone calls at all, *see, e. g.,* Konigsberg v. Ciccone, 285 F.Supp. 585, 596–597 (W.D.Mo.1968), aff'd 417 F.2d 161 (8th Cir. 1969), cert. denied 397 U.S. 963, 90 S.Ct. 996, 25 L.Ed.2d 255 (1970), a pre-trial detainee does. *See* Jones v. Wittenberg, 330 F.Supp. 707, 719 (N.D. Ohio 1971); Hamilton v. Love, 328 F. Supp. 1182, 1185 (E.D.Ark.1971). In apparent recognition of this right, the defendants have recently installed pay telephones in Greystone for the use of detainees confined there, and such telephones receive heavy use. Needless to say, eavesdropping, accomplished either by means of electronic equipment or the presence of a custodial officer, would raise serious constitutional questions. *Cf.* Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

While prison officials may inspect incoming correspondence for contraband, *but see* Smith v. Robbins, 454 F.2d 696 (1st Cir. 1972), it is difficult to justify any restrictions at all on the amount or

8. See Jackson v. Godwin, 400 F.2d 529, 541 (5th Cir. 1968) :

"[W]e have pointed out that stringent standards are to be applied to governmental restrictions [on First Amendment freedoms], and rigid scrutiny must be brought to bear on the justifications for encroachments on such rights. The State must strongly show some substantial and controlling interest which requires the subordination or limitation of these important constitutional rights, and which justifies their infringement (citations omitted) ; and in the absence of such compelling justification the state restric-

tions are impermissible infringements of these fundamental and preferred rights." In Owens v. Brierley, 452 F.2d 640, 642 (3d Cir. 1971), the Third Circuit held that constitutional rights could not be abridged with impunity "even in the name of prison discipline," and in United States ex rel. Jones v. Rundle, 453 F.2d 147, 150 (3d Cir. 1971), the same court observed that "it seems to follow that, in the case of an untried detainee who is not a disciplinary problem, even more rigid standards ought to be brought to bear." *See also* Washington Post Co. v. Kleindienst, 40 L.W. 2683 (D.D.C. April 5, 1972).

content of a pre-trial detainee's outgoing correspondence. *See* Rhem v. McGrath, 326 F.Supp. 681, 690 (S.D.N.Y.1971). Some courts appear to take the position that mail regulation is purely an administrative matter, whether the prisoner is convicted, Argentine v. McGinnis, 311 F.Supp. 134, 137 (S.D.N.Y.1969), or unconvicted, Henry v. Ciccone, 315 F.Supp. 889, 892 (W.D.Mo.1970). However, courts which have considered the problem in some detail have concluded otherwise. In Jones v. Wittenberg, 330 F. Supp. 707, 719 (N.D.Ohio 1971), the court prescribed the following standards for pre-trial detainees:

1. There shall be no censorship of outgoing mail.

2. There shall be no limitation on the persons to whom outgoing mail may be directed.

3. There shall be no censorship of incoming letters from the prisoner's attorney, or from any judge or elected public official.

4. Incoming parcels or letters may be inspected for contraband, but letters may not be read.

5. Proper arrangements shall be made to insure that prisoners may freely obtain writing materials and postage.

6. Indigent prisoners shall be furnished at public expense writing materials and ordinary postage for their personal use in dispatching a maximum of five (5) letters per week.

The court noted that prison officials need not apply the second and fourth standards to convicted prisoners. In Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970), the court reached comparable conclusions after an extensive constitutional analysis. It is at least clear that between the extremes of wholesale censorship and unbridled enjoyment of First Amendment rights, there are various alternative methods of regulating prison correspondence. The defendants must choose the least restrictive of those alternatives. See generally Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971).

Enough has been said to establish the right of pre-trial detainees to be free from any privations and restrictions which are not absolutely necessary to insure their presence at trial. Pre-trial detainees do not stand on the same footing as convicted inmates. For the latter, punishment, rehabilitation and deterrence are appropriate adjuncts of incarceration, and the courts will be loathe to interfere with the means adopted to accomplish these goals. For pre-trial detainees, however, the only constitutional purpose of incarceration is the detention itself, and the courts must intervene in appropriate cases to insure that the means adopted to accomplish that purpose are not unduly restrictive. Ultimately, of course, vindication of the rights of pre-trial detainees must derive from recognition of their status in the actions and attitudes of the defendants, and their subordinates, who are charged with the responsibility of operating the Alameda County Jails.

In conformity with the foregoing opinion, the court concludes that subjecting pre-trial detainees to restrictions and privations other than those which inhere in their confinement itself or which are justified by compelling necessities of jail administration, is a violation of the due process and equal protection clauses of the Fourteenth Amendment. Because the parties have been making substantial progress in resolving the difficult problems of conforming the Greystone facilities and procedures to constitutional requirements,

It is hereby ordered that the parties continue to report to this court on their progress in ameliorating the conditions of confinement for the plaintiff class at Santa Rita and to apprise the court of any developments in the County's plans for the construction of new jail facili-

ties. The defendants are directed to file such a return, which should include proposed rules for the treatment of pretrial detainees, within ninety (90) days of the date of this order.