**UNITED STATES of America, Plaintiff,**

v.

**Wallace COWPER, Defendant.**

**No. M 72–503.**

United States District Court, N. D. Ohio, E. D.

Oct. 12, 1972.

Edward Molnar, Asst. U. S. Atty., Cleveland, Ohio, for plaintiff.

Harry A. Hanna, Gold, Rotatori, Messerman & Hanna, James S. Carnes, Cleveland, Ohio, for defendant.

## OPINION

LAMBROS, District Judge.

The accused, Wallace Cowper, came before this Court requesting a reduction of the $100,000 surety bond previously set by the United States Magistrate on the charge of bank larceny in violation of

562

18 U.S.C. § 2113(b). Although the accused did not claim to be indigent, he was unable to post a bond in this amount. The Court, therefore, ordered a bond reduction investigation by the Probation Department.

The case presents significant questions as to the application of the Bail Reform Act of 1966 (the "Act"), 18 U.S.C. § 3146. The major issue is whether pre-trial release conditions should be used to encourage the release of persons before trial or, instead, should be utilized to retain certain persons in jail before trial in order to accomplish other goals.

■ It is the opinion of this Court that the Act requires the release of an accused on the least restrictive alternative conditions which will provide reasonable assurance that the accused will appear in court. Furthermore, the Court finds that, in applying that principle, it must consider more than the extreme alternatives of unsupervised release and jail and must permit monetary conditions to be met by the use of the desposit plan.

## I. PRINCIPLES OF PRE-TRIAL RELEASE

■ The doctrine that the federal courts are obligated to release those accused of non-capital offenses under the least restrictive alternative conditions which will provide reasonable assurance that the accused will appear in court is founded on the Eighth Amendment and presumption of innocence.[1] The nexus between pre-trial release and the presumption of innocence was explained by the United States Supreme Court in Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951):

"From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), 18 U.S.C.A., federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. . . . Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." 342 U.S. at 4, 72 S.Ct. at 3.

Moreover, the Court related the least restrictive alternative theory to the Eighth Amendment in the following statement:

"The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty . . . . Bail set at a figure higher than an amount reasonably calculated to fulfill this purpose is "excessive" under the Eighth Amendment. 242 U.S. at 4, 5, 72 S.Ct. at 3, 4.

The Bail Reform Act in 1966 re-emphasized that the purpose of any restrictions on release was to assure the presence of the accused at trial. 18 U.S.C. § 3146(a). *See also* legislative history discussed in Allen v. United States, 128 U.S.App.D.C. 207, 386 F.2d 634, 639–641 (1967) (dissenting opinion), *cited with approval in* United States v. Leathers, 134 U.S.App.D.C. 38, 412 F.2d 169 n. 1 (1969).

The recent movement to adopt preventive detention has led to some confusion as to the prevailing pre-trial release principles.[2] However, at this point, preventive detention exists legally in the federal system only in the District of Columbia. P.L. 91–358, § 23–1331 (1970). Even there, a person may not be "preventively detained" unless he is accorded certain procedural safeguards and the Government proves that his behavior presents a risk to the community. *Id.* Furthermore, the perma-

---

1. The Court does not comment here on the question of what constitutes non-bailable offense in light of the Supreme Court decision on capital punishment. *See* Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

2. *See, e. g.,* R. Hruska, "Preventive Detention; The Constitution and the Congress," 3 Creighton L.Rev. 36 (1969); J. Mitchell, "Bail Reform and the Constitionality of Pre-trial Detention," 55 Va. L.Rev. 1223 (1969).

nence of this concept of preventive detention is somewhat uncertain since the District of Columbia procedures were invoked only twenty times in the first nine months of the operation of the statute [3] and since the law has been the subject of considerable attack.[4]

In this jurisdiction, the standard for pre-trial release conditions which binds the Court remains clearly the least restrictive alternative condition which will reasonably assure appearance in court. United States v. Leathers, 134 U.S.App. D.C. 38, 412 F.2d 169 (1969); United States v. Melville, 306 F.Supp. 124, 126 (S.D.N.Y.1969).

## II. APPLICATION OF PRE-TRIAL RELEASE PRINCIPLES

In applying the law of pre-trial release to this case, the Court finds that the following two questions predominate: First, may the Court set pre-trial release conditions to insure that the accused remains in jail when it determines that unsupervised release will not reasonably assure the appearance of the accused at trial? Second, is the requirement of surety bond consistent with the Court's statutory obligation to choose the least restrictive alternative conditions?

### A. *Use of Conditions to Detain*

The framers of the Bail Reform Act intended not only to re-emphasize the principle of release as of right but also to destroy the concept that everyone not completely released prior to trial must be kept in maximum security conditions. In fact, the statute itself lists a number of alternatives between total release and surety bond, including release into the custody of a third person, requirement that a person report, day-time release, and restrictions on travel.[5] The thrust of the statute is that the Court and counsel should use conditions of release in a flexible manner, varying them to fit individual needs. United States v. Bronson, 139 U.S.App.D.C. 379, 433 F.2d 537 (1970); United States v. Leathers, 134 U.S.App.D.C. 38, 412 F.2d 169, 172 (1969).

The failure of the Courts to use the conditions flexibly has resulted in massive over-detention. The President's Commission estimated that less than a third of those detained on a nation-wide basis actually needed jail detention.[6] Other studies concur that the majority of those now held in jail detention prior to trial could be accommodated by release into the custody of others or the imposition of certain conditions upon release.[7]

3. N. Bases, Vera Institute of Justice, W. McDonald, Georgetown Institute of Criminal Law and Procedure, Preventive Detention in the District of Columbia (1972).

4. *See, e. g.*, J. Hickey, "Preventive Detention and the Crime of Being Dangerous," 58 Geo.L.J. 287 (1969); Note, "Preventive Detention: An Empirical Analysis," 6 Harv.Civ.Rights—Civ.Lib.L.Rev. 291 (1971).

5. The statute lists the following alternative between total release and surety bond:

    "(1) place the person in the custody of a designated person or organization agreeing to supervise him;

    (2) place restrictions on the travel, association, or place of abode of the person during the period of release;

    (3) require the execution of an appearance bond in a specified amount and the deposit in the

registry of the court, in cash or other security as directed, of a sum not to exceed 10 per centum of the amount of the bond, such deposit to be returned upon the performance of the conditions of release;

.   .   .   .   .

    (5) impose any other condition deemed reasonably necessary to assure apearance as required, including a condition requiring that the person return to custody after specified hours." 18 U.S.C. § 3146(a).

6. The President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Corrections 23–25 (1967).

7. The Clearinghouse of the Law Enforcement Assistance Administration estimated that only 15 to 20 per cent of those presently in local jails require maximum security detention. F. Moyer, E. Flynn, F. Powers, M. Plautz, Guidelines for the

■ In this case the $100,000 surety bond represents a refusal to use the flexible provisions of the Act to effectuate release. It represents, in fact, the use of pre-trial conditions to assure that the accused is held in jail prior to trial. Confronted with a bond of a similar amount, Judge Frankel pointed out:

> "[I]t is apparent that in this instance, as in many others familiar to all of us, the statement of the astronomical numbers is not meant to be literally significant. It is a mildly cynical but wholly undeceptive fiction, meaning to everyone 'no bail.' There is, on the evidence adduced, no possibility that any of these defendants will achieve release by posting bond in anything like the amount which has been set." United States v. Melville, 306 F.Supp. 124, 127 (S.D.N.Y.1969).

Because the denial of release conflicts with the Act, the motion to modify the bond to conditions which can reasonably be met must be granted.

### B. *The Surety Bond or the Deposit Plan*

■ Although monetary conditions of release are to be used as a last resort under the Bail Reform Act, the Court may find the imposition of such monetary conditions useful in a case involving a non-indigent defendant. In such a situation, there is some question whether and when the courts should use the deposit plan or the surety bond method of monetary bail.

Under the deposit plan, the accused may obtain release by executing a promise to pay the full amount of the bond and by depositing with the registry of the court an amount equal to not more (but less if the court so provides) than ten per cent of the amount of the bond. 18 U.S.C. § 3146(a)(3). While the ten per cent is roughly equivalent to the fee required for a similar bond to a bail bondsman, the difference under the deposit plan is that the money deposited with the court is returned to the accused when he appears for trial as promised. *Id.*

The Act provides that unless the Court can justify use of the surety bond, it must allow the accused to post the bond through use of the deposit plan. 18 U.S.C. § 3146(a). Having reviewed the studies and experience with the deposit plan as well as the surety bond, this Court is unable to justify the use of the surety bond as a means to provide assurance of appearance at trial.[8]

Studies comparing the deposit plan with the surety bond have been conducted in Illinois. There, the use of the deposit plan resulted in greater numbers of persons released prior to trial with no increase in the number of persons not appearing for trial.[9]

The Senate Subcommittee drafting the Bail Reform Act was familiar with this study of the surety bond and intended to abolish the bail bondsman through a preference for the use of the deposit plan when monetary release conditions were set.[10]

A comparison of the advantages and disadvantages of the surety bond and the deposit plan shows that the use of the deposit plan is preferable. The common-

---

Planning and Design of Regional and Community Correctional Centers for Adults D2.3, D8.5d (1971); *See also* 4 M. Burdman, "Realism in Community-Based Correctional Services," 381 The Annals 71 (Jan.1969).

8. The Court considers that, as used here, the term "surety bond" refers to a bond posted by a surety company for a fee rather than one posted by a friend or relative of the accused without a charge.

9. Following imposition of the Illinois deposit plan, the figures from the Clerk's office of the Cook County Circuit Court showed that 600 surety bonds were made and 686 deposit bonds. A higher percentage of the surety bonds were forfeited than deposit bonds. C. Bowman, "The Illinois Ten Percent Bail Deposit Provision," 1965 U.Ill.L.Forum 35, 38, 39 (1965).

10. S. Ewin, "The Legislative Role in Bail Reform" 35 G.W.L.Rev. 429 (1967); J. Murphy, "State Control of Professional Bail Bondsmen," 36 U.Cinn.L.Rev. 375, 376 (1967).

ly stated advantage of the surety bond is that the bondsman has a financial incentive to make sure that the accused appears. However, recent studies have discredited this view. First, the bondsman does not always have a financial incentive to produce the accused for trial. When, for example, he has obtained collateral for the entire amount of the bond in addition to the fee for posting the bond, he does not risk financial loss if the accused fails to appear. Pannell v. United States, 115 U.S.App.D.C. 379, 320 F.2d 698 (1963) (J. Wright, concurring). Second, investigations of bail bondsmen's activities have indicated that bail bondsmen seldom make efforts to assure the appearance of their clients.[11] Furthermore, a report by the Judicial Council for the District of Columbia indicates that bail bondsmen are unwilling to undertake any third-party custodial functions.[12]

As for the effect on the accused, there is no indication that the surety bond presents a greater monetary incentive to appear than the deposit plan, especially where no collateral is required for the surety bond. Under the surety bond system, the accused pays a non-returnable fee of about ten per cent of the amount of the bond.[13] In contrast, the money placed in the registry of the court under the deposit plan is returnable if the accused abides by the conditions of release. 18 U.S.C. § 3146(a).

Finally, while bondsmen have little constructive value in assuring the appearance of the accused persons, they have a highly destructive value.[14] A significant disadvantage of the surety bond system is that it takes pre-trial release out of the control of the courts and puts the release decision in the hands of private individuals who are not accountable to the public for the release of poor risks. *See* Pannell v. United States, 115 U.S. App.D.C. 379, 320 F.2d 698, 699 (1963) (J. Wright, concurring). In addition, the Court cannot ignore the literature describing the illicit activity which stems from the control and extortion powers of the bail bondsman.[15] Furthermore, it cannot tolerate the needless overdetention of persons whose bonds are not posted because the bond is too small to make the trip to post it profitable or because of other reasons unrelated to assuring appearance.[16]

---

11. Foote, "The Coming Constitutional Crises in Bail," 113 U.Pa.L.Rev. 1125, 1162 (1965); D. Freed, P. Wald, Bail in the United States: 1964 at 32 (1964).

12. Ervin, Preventive Detention, Senate Subcomm. on Constitutional Rights, 91st Congr., 2d Sess. at 711.

13. C. Bowman, "The Illinois Ten Per Cent Bail Deposit Provision," 1965 U.Ill.L. Forum 35, 38, 39 (1965).

14. Each of the following recommended the abolition of the bail bondsman: J. Murphy "State Control of the Operation of Professional Bail Bondsmen," 36 U.Cinn. L.Rev. 375, 408 (1967); ABA Project on Minimum Standards for Criminal Justice, Pre-Trial Release (1968). Report of the Judicial Council Committee to Study the Operation of the Bail Reform Act in the District of Columbia, in Ervin, Preventive Detention, Senate Subcomm. on Constitutional Rights, 91st Congr.2d, Sess. at 703, 710 (1970).

15. A New York City Bar Association report stated: "Whether demonstrably true or not, it is the belief of many, reached through close observation of the courts and their operation, that in an imperfect world the greatest danger of corruption of the administration of criminal justice lies in the existence of the bondsman as part of that administration." Sweet, "Bail or Jail," 19 Record of N.Y.C.B.A. 11, 18 (1964). Reported abuses included fee splitting with court personnel, excessive fees, and preferential treatment for members of criminal associations. J. Murphy, "State Control of the Operation of Professional Bail Bondsmen," 36 U.Cinn.L.Rev. 375, 391 (1967).

16. Section 2 of Senate Bill 1357, U.S. Congressional and Administrative News 1966, at p. 2293, provides:
"The purpose of this Act is to revise the practices relating to bail to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance to answer charges, to testify, or pending appeal, when detention serves neither the ends of justice nor the public interest."

In summary, the Court is unable to justify the use of the surety bond as a better method than the deposit plan to assure court appearance. Therefore, it must rule that, when monetary conditions are used, the accused shall be permitted to meet the monetary conditions under the provisions of the deposit plan.

## III.  FACTS OF THIS CASE

We have discussed above that the $100,000 surety bond violated the Act by denying release and by requiring the unjustifiable bondsman's fee. In modifying the conditions of release, the Court considered those factors listed in the Act. The Act provides:

> "In determining which conditions of release will reasonably assure appearance, the judicial officer shall, on the basis of available information, take into account the nature and circumstances of the offense charged, the weight of the evidence against the accused, the accused's family ties, employment, financial resources, character and mental condition, the length of his residence in the community, his record of convictions, and his record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings.  18 U.S.C. § 3146(b).

The facts provided by the Probation Department and presented at the hearing in this case showed that the accused had steady employment as a policeman in this community and that his family resided here.  There was no record that he had previously fled or even that he had been convicted of a non-traffic offense.  The only significant indication that he had incentive to flee was the Government's allegation that roughly $300,000 stolen in the crime charged has not been recovered.

In light of these factors and of the fact that the accused was not indigent, the Court imposed the following nonmonetary and monetary conditions:

1.  The accused shall report personally to the Probation Department once each week.

2.  The accused shall not travel except within Lake County, Ohio, and Cuyahoga County, Ohio.

3.  The accused shall execute an appearance bond of $50,000 and shall make a cash deposit of $5,000 in the registry of the Court, such deposit to be returned upon performance of release conditions.

4.  The accused shall be advised of the penalties for non-appearance under 18 U.S.C. § 3150.

## IV.  CONCLUSION

The Bail Reform Act requires the courts to re-examine pre-trial release practices.  In no other field of law is the conflict between reality and legal theory more pronounced.  While adhering in theory to the constitutional principle that a person should not be punished until he has been found guilty in a court of law, the courts in this nation have acquiesced to the fact that more than a third of those persons incarcerated on any given day have not been found guilty [17] and that pre-trial detainees are jailed in far worse conditions than those convicted of crimes.[18]

17.  In fact, over half of those incarcerated in locally-administered jails are pre-trial detainees, U.S.Dept. of Justice, 1970 Jail Census, Report SC–1 at 1.

18.  After a survey of correctional facilities, the President's Commission on Law Enforcement and the Administration of Justice, Task Force Report:  Corrections (1967) ;  stated:

"Unconvicted persons, as yet legally innocent, are almost inevitably subjected to the tightest security and receive the least attention of any group in jails  . .

Detention facilities for unconvicted persons are usually the worst of all institutions and are operated under maximum security conditions."  *Id.* at 24.

*See also* A. Rankin, "Effects of Pre-trial Detention," 39 N.Y.U.L.Rev. 641 (1964). In Jones v. Wittenberg, 330 F.Supp. 707 (N.D.Ohio 1971), Judge Young ruled that conditions of a pretrial detention facility in this district constituted cruel and unusual punishment.  *See also* Brenneman v. Madigan, 343 F.Supp. 128 (N.D.Calif.1972).

In making these rulings, the Court is cognizant of the necessity for the prompt administration of criminal justice and, where appropriate, for the imposition of punishment after valid criminal convictions. At the same time, the Court must use care to avoid constitutional transgressions. On this basis, it is time to sound the death knell for the bail bondsman, lest the constitutional right of reasonable bail and the presumption of innocence become luxuries for the affluent.

The Court, therefore, grants the defense motion for a modification of pretrial release and imposes those conditions listed above.

It is so ordered.