ROY BARNES, on behalf of himself and all others similarly situated, Plaintiffs

v.

WINSTON GIBSON, in his capacity as Commissioner of Public Safety; GEORGE WASHINGTON, in his capacity as Warden of Golden Grove Adult Correctional Facility; RICHARD SHRADER, in his capacity as Assistant Warden of Golden Grove Adult Correctional Facility; HENRY ARMSTRONG, in his capacity as Acting Captain of Golden Grove Adult Correctional Facility; and CYRIL E. KING, in his capacity as Governor of the U.S. Virgin Islands, Defendants

Civil No. 1976/191

District Court of the Virgin Islands

Div. of St. Croix

September 15, 1977

345

STEVEN XANTCHOPOULOS, ESQ. (Legal Services of the Virgin Islands), Christiansted, St. Croix, V.I., *for plaintiffs*

RODERICK Q. LAWRENCE, ESQ., Assistant Attorney General (Department of Law), St. Thomas, V.I., *for defendants*

YOUNG, *District Judge*

### MEMORANDUM OPINION WITH ORDER ATTACHED

#### I

Unlike most other cases which come before this Court, this lawsuit is of concern, not simply to the parties directly involved, but to all of us who live in the Virgin Islands. This Court, for years, has agonized over the deplorable state of affairs at the Golden Grove Correctional Facility. However, it has not until most recently become the subject of genuine and legitimate public concern.

The latest developments at the prison have understandably caused the public to question what is transpiring at the facility. Unfortunately the Government's response has consisted of blaming the Court for all the wrongs that have taken place at Golden Grove and accusing the Court of trying to run the prison. Nothing could be further from the truth. The primary purpose of this opinion is to appraise the public of what, in actuality, has taken place,

and most importantly what must be done at the prison facility. The Government was advised approximately one year and four months ago. Its response has been to do virtually nothing, to allow an already intolerable and explosive situation to become worse, and to point an accusatory finger at the Court when the inevitable finally came to pass. It is of the utmost importance that the public understand fully the situation at Golden Grove, for in the final analysis, the people of the Virgin Islands will have to decide whether they wish to maintain a prison on St. Croix, or whether they wish to send convicted felons to stateside institutions.[1]

## II. THE DOCTRINE OF SEPARATION OF POWERS

Since the commencing of this lawsuit in March of 1976, the Government has steadfastly maintained that the Court has no business meddling in prison affairs and that the manner in which the facility at Golden Grove is run is solely within the decisional province of the executive branch. The Government essentially maintains that once this Court sentences an individual to serve a term of imprisonment, the Court has no further say as to the manner in which incarceration can be effectuated.

To a considerable extent the Government's proposition is valid and the Court welcomes the generally limited role it has to play in this area. The legislature, the executive branch and the judicial branch each have their respective areas of responsibility and as to such areas, in large part, have the sole and final say as to the manner in which decisions are to be carried out. It is within the province of the legislature to enact laws; the executive branch is respon-

---

[1] Act No. 4054 of the Virgin Islands Legislature, approved Oct. 28, 1977, and effective Jan. 1, 1978, created a "Bureau of Corrections" and passed measures dealing with the correctional system problems which are the subject of this and prior opinions of the district court. See 5 V.I.C. §§ 4501–4509, to which Act No. 4054 was classified.

sible for enforcing those laws; the courts are called upon to interpret the laws.

Yet the system of government under which we live oftentimes envisages considerable interplay between the various branches. A judge sits on the bench by virtue of having been nominated for said position by the executive branch and approved therefor by the legislature. Although the enactment of laws is initially within the province of the legislature, the executive branch has the power to exercise a veto, and the legislature, in turn, to override any such veto. Finally, when an act of the legislature is in any manner unconstitutional, or when the manner in which the executive branch enforces a law violates an individual's constitutional rights, it is the duty of the courts to void such law or to protect the rights of the wronged individual. It is understandable that each branch of government is very reluctant to yield any of its authority to another branch. However, the notion of checks and balances constitutes the very essence of our system of government. It is absolutely essential that no one branch of government lose sight of its proper role and attempt to place itself above the law.

In principle this lawsuit is but one example of the manner in which our government must operate. Although corrections and the operation of our prisons is a matter vested in the authority of the executive branch and, specifically, the Department of Public Safety, said authorities are not free to do whatever they please with prison inmates. Convicts are human beings. To be sure, by virtue of their convictions they lose certain vestiges of freedom; however, they nonetheless are protected in many ways by the constitution. When an inmate satisfactorily demonstrates to the Court that his constitutional rights are being violated, the Court cannot sit idly by and ignore his pleas. I am fully aware of and sympathetic with the fact that the inmates

at Golden Grove are "doing time" because they chose to violate the rights and freedoms of their fellow man. It is often times difficult to comprehend how an individual can commit murder, robbery or assault and then complain to the Court when he feels he is receiving unjust treatment in prison. However, my responsibility and sworn duty is to uphold the constitutional rights—whatever they may be —of all who come before me. No matter how unpopular a particular decision might be, if the law so commands, I must adhere to it. And if the law requires that the executive or legislative branch of government must do or refrain from doing some act, said branch of government must conform its conduct to the requirements of the law. To do otherwise would be to ignore the very foundation upon which our system of government rests. See, e.g., Procunier v. Martinez, 416 U.S. 396, 405 (1974); James v. Wallace, 406 F.Supp. 318, 328 (M.D. Ala. 1976).

A final word is in order with respect to the separation of powers argument. During the past decade it has become apparent that political figures are increasingly reluctant to make hard, unpopular decisions. Where a decision one way or the other on a particular issue poses the risk of alienating a large segment of the voting populace, the politician has been prone to do nothing, force the decision making task upon the courts, and disclaim all responsibility for the consequences to his constituents. Recent obvious examples in the states include the heated issues of school busing, abortions and prison reform. These are political issues whose resolution are more appropriately left for the executive and legislative forums. If said authorities would, in the first instance, take it upon themselves to make the necessary, although potentially unpopular, decisions the courts would never need to become so deeply involved in such matters. If the Government of the Virgin Islands would assume the responsibility of diverting the necessary

monies from other areas of expenditure and channeling them into prison reform, and if the Government would demonstrate a genuine, sincere concern over the state of our prison facilities, this Court would not be involved. In short, I am not trying to run the prison facility. I have no such desire. Should the Government assume what has always been its proper role and undertake the hard but necessary task of rectifying the constitutional ills which plague the Golden Grove facility, I will welcome the opportunity to close this case.

## III. HISTORY OF THIS LITIGATION

This case was spawned by the filing of a civil rights petition, in March of 1976, by Roy Barnes, an inmate at the Golden Grove facility. Upon the request of the Court, Legal Services of the Virgin Islands agreed to provide representation for said inmate and an amended complaint was eventually filed on June 10, 1976 on behalf of all the inmates at the prison complex.

This Court has always received a steady influx of prisoner complaints pertaining to conditions and treatment at the prison. At the time the original complaint was filed herein, however, the rate of prisoner petitions had increased dramatically. Additionally the Court was receiving numerous reports of a near riotous situation at the prison complex. Accordingly, on March 31, 1976, I appointed an independent, five person commission to investigate the correctional facility and all phases of its operation, and to submit findings of fact and recommendations. After an extensive investigation, the Commission completed its work on May 1, 1976 by submitting to the Court a carefully prepared, thoroughly documented final report stating its findings and recommendations. Having granted the Government opportunity to present evidence in contravention to said findings of fact, and having been fully satisfied that

the report of the Commission thoroughly and accurately depicted the then prevailing situation at Golden Grove, I adopted the findings as my own.[2] Barnes v. Government of the Virgin Islands, 415 F.Supp. 1218 (D. V.I. 1976).

The findings of the Commission revealed that totally intolerable conditions existed at the prison as to practically every aspect of its operation. Thirty-six individual problem areas were listed in the report and the Commission set forth specific findings of fact and recommended reform measures as to each of the areas. The findings of the Commission indicated a total lack of initiative and imagination on the part of the prison administration, and most importantly, a lack of genuine concern over the state of our prison on the part of the Government.

Based upon the Commission's thorough report, I placed the Government on notice as to the deficiencies at the prison which reached constitutional dimensions. In an opinion dated May 20, 1976, I set forth the constitutionally proscribed minimum standards of incarceration with respect to medical and dental care, mental health, dietary conditions, mail censorship procedures, visitation rights, disciplinary practices and grievance procedures.

In the May 20, 1976, opinion, I stressed the critical need for the implementation of some semblance of rehabilitative programs at the prison, and I again stress the need today. There is in point of fact no rehabilitative efforts taking place at the correctional facility. Inmates are not being taught marketable skills so that they might have some chance of "making it" upon their release. Basic education courses are not being provided despite available volunteer resources. Recreational opportunities are very limited and haphazard, there being little or no organized ac-

_____

[2] See, e.g., Ex rel. Peterson, 253 U.S. 300 (1920); Schwimmer v. United States, 232 F.2d 855 (8th Cir. 1956); Costello v. Wainwright, 387 F.Supp. 324 (M.D. Fla. 1973); Hamilton v. Landrieu, 351 F.Supp. 549 (E.D. La. 1972).

tivities. I fully realize that prison cannot reform all or even a large majority of convicted criminals. But this does not mean that our prison does not have to provide a reasonable, meaningful opportunity for those who wish to make a better life for themselves upon their eventual return to society. At the very least we should not permit our Government to stifle the efforts of those who do wish to reform.

With the amount of money now being channelled into the prison through the Department of Public Safety, surely we must hope for more of a return on the expenditures than simply being protected from the inmates during their period of incarceration. The crimes being committed in the Virgin Islands today are increasingly the product of youthful offenders. What sense does it make to send these kids to Golden Grove for three, four and five year terms and allow them to spend day after day simply sitting around in the tropical sun, only to reenter a life of crime upon their eventual release. "If a man who is ignorant and unskilled when he goes into prison can come out with some education and some usable skill, he has an improved chance of staying out of prison in the future. If he comes out as ignorant and unskilled as he goes in, recidivism on his part is almost inevitable." Holt v. Sarver, 309 F.Supp. 362, 379 (E.D. Ark. 1970). Whether rehabilitation will work in 50 percent of the time or 25 percent of the time is really not the point. What is germane is that we at least try to get to the root of our crime problem in the Virgin Islands. When the present situation in our community is dwelled upon but for a moment, it becomes clear that here lies an area where tax dollars can truly be put to meaningful use.

In conjunction with the issuance of the Court's opinion on May 20, 1976, the Court entered an extensive Order directing the Government to effectuate various reforms at the prison. Said Order pertained to the areas of staff training and organization, inmate rules and discipline, inmate

classification procedures, rehabilitation, visitation and mail privileges, food, medical care, and the unique problems of pretrial detainees. The Government thereafter appeared before this Court stating that it would voluntarily conduct its own investigation of the prison and implement whatever changes were necessary. In order to cooperate as much as possible with the government officials this Court agreed to postpone or stay the execution of its Order for 60 days. Pursuant to repeated representations by the Government that it would do whatever was necessary without the need for Court intervention, this Court effectively stayed the execution of its Order for a year.

In May of 1977, the parties again came before this Court to present evidence as to changes that had been implemented at the prison during the past year. Although some matters had been cured, based upon the host of problems in existence at Golden Grove, it would be appropriate to say that virtually little and close to nothing had been accomplished. Witness after witness testified that changes would be made soon—that reform was just around the corner. Government employees stated that the new budget would provide ample funds to effectuate reform, and all that was needed was a little more time. A year had now elapsed and the promises of the Government were becoming somewhat meaningless. Nonetheless the Court again agreed to give the Government more time to tackle the prison problems itself, without Court intervention.

Four months have now passed since the May 1977 hearing. One year and four months have passed since the Court first appraised the Government of the necessary reforms at the correctional facility. Little or nothing has been done. The Court has not seen any semblance of evidence which would indicate that the Government *sincerely* intends to come to grips with the problems at hand. While it has become increasingly clear that there are some officials at the

prison who genuinely wish to reform the facility, it has also become more readily apparent that the obstacles to reform lie at the highest levels of the executive branch of government.

To say that this Court is trying to run the Golden Grove facility—to accuse this Court of unnecessarily meddling in prison affairs—is to ignore the history of this litigation. From the outset I have done everything within my power to cooperate with the Government, and to permit the Government to handle its own affairs. If I could see the slightest indication that the defendants were honestly concerned with effectuating reform at the prison and intended to make more than a superficial and illusory effort to transform the facility into a viable correctional institution, I would gladly permit them to do so without judicial intervention. But aside from promise after promise after promise, nothing of any import has been done. The desire of certain officials and advisors at the prison facility to make needed changes cannot be questioned. What is missing, however, is a commitment on the part of the Government itself to make the prison work.

This Court will not take it upon itself to run the prison facility or effectuate the needed reforms. Such is beyond the capabilities and proper function of this Court. However, I simply cannot permit the constitutional rights of the inmates to be violated. If we wish to run a facility on St. Croix, we must do so in a manner which conforms to the requirements of the law. Otherwise, we must send Virgin Islands felons to stateside institutions. Much can be said for the latter alternative for it would provide an inmate with sufficient medical care and rehabilitative treatment. Regardless of the merits of either alternative, the choice for the people of the Virgin Islands is clear. We either resolve to operate an effective prison system, or we limit the use of the facility to the detention of less-serious

offenders and transport all serious offenders to the states. There is no third alternative.

This Court's Order of May 20, 1976, encompassed a wide range of problems at the correctional facility. Given the conduct of the Government over the past year and four months, it would be more than appropriate for this Court to reissue such an order. However, to do so would perhaps place an impossible burden upon the Government. My goal is to see the prison reformed, however it be accomplished. Accordingly, I will limit the scope of the order attached hereto to two of the more serious problems besetting the correctional facility—the conditions of confinement of pretrial detainees and the absence of written rules governing inmate conduct and disciplinary hearings. Once these matters are rectified, the other areas of needed reform will be dealt with in a similar piecemeal fashion. By so proceeding, the Government should be fully able to comply with the directives of this Court.

I cannot stress enough that politics and personal squabbles have no place whatsoever in these proceedings. We are dealing with the mandates of our constitution. We are dealing with the lives of human beings. No one is benefiting from the expenditures currently being made at the Golden Grove facility.

## IV. THE RIGHTS OF PRETRIAL DETAINEES

The correctional facility on St. Croix houses both convicted felons and misdemeanants, and persons who, although charged with having committed some offense, have not been convicted of any crime. In discussing the rights of the latter class of persons—the pretrial detainees—it is essential to understand why they are incarcerated.

A pretrial detainee is presumed, by the law, to be innocent of any crime charged. He has not been adjudged a criminal. The only legitimate purpose for incarcerating

356

persons accused of a crime is to guarantee their presence at trial. Punishment has no place with respect to such persons. In point of fact, the vast majority of those at Golden Grove who are awaiting trial are housed at the prison for the sole reason that they do not have the money needed to post bail. Were it not for their lack of financial resources, the detainees while awaiting trial would be free to come and go as they please, reside at home, visit with friends and maintain their occupational positions.

The critical distinction between pretrial detainees and convicts is that the *only* legitimate purpose for incarcerating persons accused of a crime is to guarantee their presence at trial. See, e.g. Anderson v. Nosser, 438 F.2d 183 (5th Cir. 1971). A detainee retains all of the rights of an ordinary citizen except those necessary to assure his appearance for trial. Rhem v. Malcolm, 371 F.Supp. 594, 622 (S.D. N.Y. 1974). It has also been stated that, ". . . it is manifestly obvious that the condition of incarceration for detainees must, cumulatively, add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty." Hamilton v. Love, 328 F.Supp. 1182, 1192 (E.D. Ark. 1971).

The courts have devised a wide range of theories as justification for the different treatment of pretrial detainees. Mindful of the traditional reluctance of federal courts to interfere with the administration of a penal system, most of these theories are constitutionally based, since, "when questions of constitutional dimension arise, the courts cannot simply abdicate their function out of misplaced deference to some sort of 'hands off' doctrine." Brenneman v. Madigan, 343 F.Supp. 128, 131 (N.D. Cal. 1972).

Other than the mere fact of confinement which is thought to be necessary to assure the accused's presence at trial, the institution may only limit the freedom of a

pretrial detainee to the extent needed to maintain the security of the institution. In Seale v. Manson, 326 F.Supp. 1375 (D. Conn. 1971) the court held that pretrial "detainees may be treated as convicts only to the extent the security, internal order, health and discipline of the prison demand." In practical terms the problem at Golden Grove arises when the institution attempts to justify every restriction and deprivation on pretrial detainees by instituting the limitations under the guise of "security" and "discipline".

The problem for the courts, as stated by Judge Zirpoli in Brenneman v. Madigan, supra, is to attempt:

to strike a balance between the legitimate demands of pretrial detainees for the unfettered enjoyment of those rights which they should possess as persons unconvicted of any crime and the compelling custodial necessities of jail administration. 343 F.Supp. at 140.

To give some meaning to these court decisions making a special class of pretrial detainees, I will provide an analysis of the specific rights and restrictions affecting persons incarcerated pending trial.

■ (1) In terms of security classification, pretrial detainees must be held in the least restrictive alternative available for maintaining the security of the institution. This is not to say that detainees may never be held under maximum security conditions. However, such limitations may be imposed *only out of necessity*, and not as a matter of administrative convenience or routing. Brenneman v. Madigan, supra, at 140. A detainee may not be held under maximum security conditions simply because there is nowhere else to put him. A classification system should be established to determine those who do and who do not require maximum security custody.

■ (2) The doctrine of least necessary restraint as it has been applied to pretrial detainees requires that vis-

itations at the prison be curbed "only to the extent needed to assure institutional security and administrative manageability". Rhem v. Malcolm, 371 F.Supp. at 625. As Judge Lasker explained:

Nevertheless, we find that the present visiting system, which denies presumably innocent detainees (20% of whose cases may well be dismissed, many of whom are held for long periods, and all of whom are in custody solely because of the inability to furnish bail) the right to shake hands with a friend, to kiss a wife, or to fondle a child, to be inhumane and cruel in fact. 371 F.Supp. at 626.

The general rule as announced by Judge Zirpoli in the Brenneman case is that, "As a general proposition, a pretrial detainee should be able to visit with whomever he pleases, especially his children, for substantial periods of time each week."

(3) Many courts have applied different standards with respect to pretrial detainees and convicted persons in judging the validity of limitations on correspondence. In Jones v. Wittenberg, 330 F.Supp 707, 719 (N.D. Ohio 1971), the court prescribed various standards regarding correspondence as applied to pretrial detainees. Among these were two standards which the court said need not be applied to convicted persons: (1) there can be no limitation on the persons to whom outgoing mail may be directed and (2) incoming parcels or letters may be inspected for contraband, but letters may not be read. See, also, Palmigiano v. Travisono, 317 F.Supp. 776 (D. R.I. 1970).

▮ Likewise, where some cases 'may deny convicted persons the right to make any telephone calls, see Konigsberg v. Ciccone, 285 F.Supp. 585 (W.D. Mo. 1968), a pretrial detainee does have a right to make telephone calls. Jones v. Wittenberg, supra; Hamilton v. Love, supra.

▮ The evidence adduced at the trial held in May of 1977 and this Court's visit to the prison at that time, re-

veals that detainees at Golden Grove sleep in cells at one end of one of the prison dormitories, the other end as well as the remainder of the dorms being employed for convicted prisoners. Beyond this housing arrangement, however, there appears to be no distinction drawn between pretrial detainees and convicts by the prison administration. As with the other problem areas at the prison, the Government was advised over a year and four months ago of the need to introduce reform measures. Unfortunately, compliance has not been forthcoming.

Ordinarily it would be sufficient for this Court to order that the above mentioned principles be implemented. However, one aspect of the situation at Golden Grove mandates the implementation of stronger measures. For years this Court has received continuous reports of violence among inmates at the prison compound. Time after time this Court has heard statements under oath, from inmates and detainees alike, describing the dangerous conditions prevalent at the facility. As recently as August 31, 1977, a detainee came before this Court and, under oath, described his experience at Golden Grove. He related that within twenty minutes after being placed in his dormitory he was held by an inmate at knifepoint, relieved of his watch and money, and then forced to remain on the floor for eight hours under a threat of death. When asked why he did not leave his valuables with the prison officials, he responded that he had in fact deposited a considerable sum in the prison safe—but that too was missing the following morning.

This Court has heard far too many such reports to dismiss them away as unsubstantiated. It is readily apparent that the lack of discipline at the prison constitutes the most serious deficiency in its administration. Weapons among the prisoners abound. Yet despite the obviousness

of the problem, the situation has grown progressively worse with the passage of time.

█ Pretrial detainees are incarcerated solely to assure their presence at trial, and only then because they don't have the money needed to post bail. They are guilty of no crime. They are my responsibility. I can no longer allow them to be confined, pending trial, under such intolerable conditions. I cannot permit their lives to be placed in jeopardy. Accordingly, given the indifference of the Government over the past year and four months to the pronouncements of this Court as to the constitutional limitations on the incarceration of detainees, as well as the unique and dangerous conditions prevalent at our prison, I must order the Government to provide separate detention facilities for those persons who are to be held pending trial.

On September 2, 1977, I held a conference in my chambers pertaining to the problems regarding pretrial detainees. Among those present were United States Attorney Julio Brady, Alexander Hanschen of the Immigration and Naturalization Service, Captain Raymond Chesterfield, Supervisor of the Ft. Christian jail on St. Thomas, Roderick Lawrence of the Virgin Islands Department of Justice, Stephen Xantchopoulos of Legal Services of the Virgin Islands, and Roy Siebenhoven, of the Golden Grove Adult Correctional Facility. It became apparent at said conference that the heretofore vacant facility at Annas Hope on St. Croix could readily be utilized for the housing of pretrial detainees. I will accordingly order the Government to so employ the Annas Hope facility.

Although the in-chambers conference revealed no formidable obstacles to curing the detainee problem in such a manner within a short time, I will provide the Government with sixty days time to comply with the Court's Order. By so providing, the Government will have more than

ample time to assure adequate security, staffing and furnishings at the Annas Hope facility.

Once again I must implore upon the Government to refrain from turning the prison problem into a political football. We are dealing with an issue of extreme importance to the people of the Virgin Islands. We are dealing with the lives of human beings. We face grave problems at the correctional facility which must be cured. If we are to have a correctional facility on St. Croix, it must be run in a manner which abides by the mandates of the constitution. If we are to detain individuals awaiting trial, we cannot in so doing place their lives in jeopardy. Sixty days is ample time to effectuate the necessary implementations at Annas Hope.

It is necessary at this stage to place the Government on notice as to the sanctions this Court will be forced to impose in the event of non-compliance with today's Order. If a separate, safe and secure facility is not provided for pretrial detainees within sixty days time, I have two optional sanctions to impose. One is to be more liberal with the pretrial release of persons accused of having committed crimes. The other option is to hold in contempt of court appropriate Government officials for not complying with the Court's order.

## V. THE PREPARATION AND DISSEMINATION OF RULES GOVERNING PRISONER CONDUCT AND DISCIPLINARY PROCEEDINGS

One of the principal problems at the Golden Grove prison facility pertains to the lack of adequate discipline of inmates. In rectifying this situation, however, it is imperative that the Government effectuate disciplinary measures in accordance with the constitutional standards. Discipline cannot be imposed in an arbitrary and capricious manner. Barnes v. Government of the Virgin Islands, 415

F.Supp. at 1232, citing James v. Wallace, 406 F.Supp. 318 (M.D. Ala. 1976). To protect prisoners from arbitrary treatment, prison administrators must promulgate written rules which set forth prohibited conduct with specificity. Battle v. Anderson, 376 F.Supp. 402, 421 (E.D. Okla. 1974). A prisoner may not be punished unless he has violated these written rules. 376 F.Supp. at 421.

■ The regulations must also provide a reasonable range of penalties for infractions of particular rules. Taylor v. Perini, 413 F.Supp. 189 (N.D. Ohio 1976). Said rules and regulations must be distributed to the entire inmate population. By so providing, the goals of both fair and adequate discipline at the prison facility should be much easier to attain.

This Court has advised the Government that disciplinary procedures which comport with Wolff v. McDonnell, 418 U.S. 539 (1974) be established. In Wolff the Supreme Court held that inmate disciplinary hearings must be conducted according to the following procedures: (1) written notice must be given to an inmate accused of a rule violation; (2) the inmate must be given at least twenty-four hours to prepare for a disciplinary hearing; (3) a written statement by the fact-finders as to the evidence relied upon and reasons for the disciplinary actions must be made; and (4) an inmate must be permitted to call witnesses and present documentary evidence at his disciplinary hearing.

■ At the above-mentioned in-chambers conference on September 2, 1977, it was represented to the Court that progress was being made in this regard. After one year and four months of unfulfilled promises, however, the Court must enter an Order mandating the preparation and dissemination of inmate rules of conduct as described above as well as the preparation, dissemination and *imple-*

*mentation* of rules governing disciplinary hearings. The Court will again grant sixty days time to comply with said Order. During the interim period it is strongly advised that prison officials, including representatives from the guards, together with the Government attorneys, review the proposed rules and procedures and insure that the constitutional standards are met. In this manner the need for further Court intervention will be obviated.

## VI. CONCLUSION

This Court cannot stress enough its desire to allow the executive branch of Government to fully administer and conduct the affairs of the prison. I have no desire to run the facility. This Court's role is solely a function of its sworn duty to uphold the constitution. If we want to house convicted felons in the Virgin Islands, we must abide by the requirements of the law. If we cannot make the financial and moral commitment necessary to so operate the prison facility, then we must send felons to stateside institutions.

I have employed all the restraint that my conscience will allow. I can no longer sit idly by and listen to promise after promise from the Government and at the same time witness a steady deterioration of the situation at Golden Grove. The issue is not a political one. Personalities have no place herein. If the Government sincerely wishes to rectify the conditions at Golden Grove without further Court proceedings, it need only demonstrate its sincerity to effectuate judicial deference to administrative discretion.

It is my hope that the public squabbling and inaccurate press releases will end here.[3] I have attempted to clarify the history of this litigation and to accurately portray the

---

[3] Contrary to recent press releases concerning the stabbing of a prison guard, I have *never* authorized an inmate to leave the facility on his own in order to secure employment.

role this Court has played in the past and must play in the future. The present condition at Golden Grove is the product of protracted administrative neglect. This Court has continually done everything within its power to cooperate with the Government, and will continue to do so in the future.

## ORDER

In accordance with the reasons set forth in the Memorandum Opinion of even date herewith, it is hereby

ORDERED

1. That within sixty days from the date of this Order, all persons presently being detained at the Golden Grove Adult Correctional Facility pending their respective trials, be removed therefrom and confined at the Annas Hope Facility where there shall be staffed adequate guards and logistic staff for quartering and feeding such detainees. Thereafter, all detainees, awaiting trial in St. Croix, shall be incarcerated therein.

2. Inasmuch as the Ft. Christian jail on St. Thomas is not equipped or designed to house convicted prisoners but is suited solely for the purpose of holding pretrial detainees, sixty days from the date of entry of this Order, the defendants shall appear before this Court to show cause why all convicted inmates presently incarcerated at the Ft. Christian jail should not be transferred to the Golden Grove Adult Correctional Facility.

3. That within sixty days, printed rules and regulations setting forth the standards governing inmate conduct at the Golden Grove Adult Correctional Facility and the Annas Hope Facility, the sanctions for the violation of said rules and the procedures governing disciplinary proceedings shall be disseminated to all inmates and detainees at said facilities.